BOWNES, Senior Circuit Judge.
 

 This appeal by defendant-appellant John Carl DelBonis, a chapter 7 debtor, concerns the dischargeability of educational loans under 11 U.S.C. § 523(a)(8). The District Court for the District of Massachusetts reversed a bankruptcy court order granting DelBonis summary judgment. Debtor’s appeal from that decision asks us to do two things: reverse the district court’s holding that federal credit unions are nonprofit organizations and hold that educational loans issued to him by creditor-appellee TI Federal Credit Union are, therefore, dischargeable in bankruptcy. We deny both requests.
 

 Instead, we affirm the result achieved by the district court — that debtor’s loans are nondischargeable — and elect not to reach the issue of federal credit unions’ nonprofit status. Because our conclusion that federal credit unions qualify as. government units within the meaning of 11 U.S.C. § 523(a)(8) provides a sufficient legal basis for upholding the district court’s order, we reserve the issue of whether such organizations qualify as nonprofit organizations within the meaning of that statute for another day. Jurisdiction of this appeal stems from 28 U.S.C. § 158(d).
 

 
 *925
 
 I. THE FACTS
 

 Financial difficulties caused defendant-appellant John Carl DelBonis (“DelBonis”) to file for bankruptcy under Chapter 7 of the Bankruptcy Code on September 20, 1993. DelBonis’s Chapter 7 application, which he filed in the Eastern District of Massachusetts, listed,
 
 inter alia,
 
 educational loans he obtained on behalf of his wife and children as debts to be discharged. The loans, from which DelBonis obtained .no direct personal benefit and on which he is the sole obligor, were acquired from the Texas Instrument Federal Credit Union, (“TIFCU”) while Del-Bonis was employed at Texas Instruments, Inc. DelBonis’s employment with Texas Instruments, Inc., one of nine institutional members of TIFCU, terminated in November, 1992.
 

 Chartered on May 9,1960, pursuant to the Federal Credit Union Act, 12 U.S.C. § 1751
 
 et seq.,
 
 TIFCU is a federal credit union and has its principal place of business in Attle-boro, Massachusetts. Like most federal credit unions, TIFCU provides a variety of credit, savings, and financial counseling services to its members. Loans — educational; home equity; residential real estate; and member business — however, represent TIF-CU’s primary investment.
 
 Cf.
 
 National Credit Union Administration, Office of Examination and Insurance,
 
 Federal Credit Union Handbook
 
 11 (1988). Because TIFCU is a federal credit union, its loan activities are heavily regulated by the National Credit Union Administration (“NCUA”).
 
 See generally
 
 12 C.F.R. Ch. VII (1-1-95 Edition). NCUA exists within the executive branch of the federal government and was established in 1970 to “prescrib[e] rules and regulations for the organization and operation of federal credit unions....”
 
 Federal Credit Union Handbook, supra,
 
 at 2.
 

 DelBonis took out his first educational expense loan with TIFCU on December 27, 1985, for the sum of $3,500.00. TIFCU advanced the loans as part of a special educational loan program. The program, which was not federally guaranteed, had several attractive features. It made loans at low interest rates, gave borrowers longer repayment periods, and allowed loans to be aggregated in maximum amounts greater than those permitted under personal loan programs.
 

 One of the most appealing features of TIF-CU’s educational loan program was that it enabled borrowers to simultaneously borrow additional funds and refinance outstanding balances on previous loans. DelBonis took advantage of this feature on numerous occasions. Under the requirements of the loan program, the proceeds from each transaction were paid directly to the educational institution DelBonis specified.
 

 During the period spanning December 27, 1985 to January 4, 1991, DelBonis turned to TIFCU sixteen times for assistance in meeting his family’s educational needs. Each time TIFCU responded by granting him the funds he requested. In fact, TIFCU advanced a total of $43,114.87 in loan proceeds on DelBonis’s behalf. DelBonis ultimately asked and was permitted to consolidate these loans into a single promissory note for $39,-064.46, payable over ten years, with interest at 9.6% per annum. A principal balance of $32,618.27 is currently due on that amount.
 

 II. THE PROCEEDINGS BELOW
 

 On December 3, 1993, nine months after DelBonis filed for Chapter 7 bankruptcy and, thereby, sought to avoid repayment of his loan debt, TIFCU initiated a bankruptcy court adversary proceeding. TIFCU requested a determination as to whether 11 U.S.C. § 523(a)(8) rendered the educational loans issued to DelBonis nondischargeable in bankruptcy. TIFCU argued that its status as a nonprofit required a finding of nondis-chargeability under the statute.
 

 Six months after the adversary proceedings began, the parties submitted an Agreed Statement of Fact to the bankruptcy court. That document included the erroneous stipulation that “TIFCU is not a governmental unit_”
 
 Agreed Statement of Fact
 
 at 2. DelBonis filed a motion for summary judgment on June 6, 1994, almost immediately after the Agreed Statement of Fact was filed with the bankruptcy court. His summary judgment motion raised two issues bearing on 11 U.S.C. § 523(a)(8)’s applicability in this
 
 *926
 
 ease: 1) whether TIFCU is a nonprofit institution; and 2) whether debtor’s loans became due within the seven-year period prescribed by 11 U.S.C. § 523(a)(8).
 

 The bankruptcy court granted summary judgment on the first issue and, based on its analysis, did not reach the second issue. The bankruptcy court found that “loans incurred to educate members of a debtor’s family qualify as educational loans within the meaning of 11 U.S.C. § 523(a)(8).”
 
 In re Delbonis,
 
 169 B.R. 1, 2 (Bankr.D.Mass.1994). It ruled, however, that federal credit unions are not nonprofit organizations entitled to Section 523(a)(8) protection because they are comprised of member-shareholders and are authorized to issue dividends to such members.
 
 Id.
 
 The bankruptcy court found that nonprofit organizations do not possess such characteristics.
 
 Id.
 
 at 3-4. The bankruptcy court acknowledged that TIFCU’s suit raised a novel issue of law and, therefore, denied debtor’s requests for fees and costs.
 
 Id.
 
 at 4.
 

 TIFCU appealed the bankruptcy court’s decision on June 28, 1994 and filed a Motion to Amend the Agreed Statement of Fact on the ground that it included a stipulation erroneously denying TIFCU’s legal status as a government unit. The bankruptcy court denied TIFCU’s Motion to Amend on July 11, 1994. TIFCU subsequently filed a new Notice of Appeal challenging both the bankruptcy court’s summary judgment order and denial of the Motion to Amend the Agreed Statement of Fact.
 

 On appeal, the district court reversed the bankruptcy court’s grant of summary judgment. It held that federal credit unions qualify as nonprofit organizations under Section 523(a)(8) and issued a detailed opinion outlining the legal and policy-based justifications for such a classification.
 
 Id.
 
 at 5. Our decision in
 
 La Caisse Populaire Ste. Marie v. United States,
 
 563 F.2d 505 (1st Cir.1977), defining a credit union as “a democratically controlled, cooperative, nonprofit society organized for the purpose of encouraging thrift and self-reliance among its members ...,” was cited as support for the district court’s reversal.
 
 Id.
 
 at 4-5
 
 (quoting La Caisse Populaire Ste. Marie v. United States,
 
 563 F.2d 505, 509 (1st Cir.1977)).
 
 La Caisse
 
 held that state credit unions are entitled to general income tax exemption under Section 501(c)(14)(A) of the Internal Revenue Code. Because the ground on which it based its decision independently warranted a finding that debtor’s loans are nondischargeable, the district court deemed it unnecessary to “reach the question whether [the bankruptcy court judge] should have allowed the appellant’s motion to amend its agreed statement of facts regarding ,.. [TIFCU’s] status as a federal instrumentality.”
 
 Id.
 
 at 5.
 

 III. THE STATUTE
 

 Resolution of this ease, as the following discussion reveals, requires us to consider a gaggle of statutes and statutory issues. Questions about the status of federal credit unions implicate the Federal Credit Union Act, 12 U.S.C. § 1751
 
 et seq.,
 
 bankruptcy law, and the federal income tax code.
 
 See
 
 26 U.S.C. § 501. Because the possibilities for confusion run high, we think it important to clearly set out the terms of 11 U.S.C. § 523(a)(8), the statute on the basis of which TIFCU initiated the adversary proceeding. In relevant part, 11 U.S.C. § 523(a)(8) provides:
 

 (a) A discharge under section 727, 1141, 1228(a), 1228(b) or 1328(b) of this title does not discharge an individual debtor from any debt—
 

 (8) for an educational benefit overpayment or loan made, insured or guaranteed by a government unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend, unless — (A) such loan, benefit, scholarship, or stipend overpayment first became due more than 7 years (exclusive of any applicable suspension of the repayment period) before the date of the filing of the petition; or (B) excepting such debt from discharge under this paragraph will impose an un-due hardship on the debtor and the debtor’s dependents.
 

 In summary, Section 523(a)(8) offers two alternatives for adjudicating educational loans issued by a federal credit union nondischargeable. First, it provides that edu-
 
 *927
 
 eational loans or benefit overpayments are nondischargeable, if issued in whole or in part by an agency qualifying as a nonprofit organization. Second, the statute also mates loans issued, insured, or guaranteed by governmental units nondischargeable. A debt- or’s loans, thus, are nondischargeable if they fall within the parameters of either provision.
 

 Congress delineates only two exceptions to this nondischargeability policy. A demonstration that the educational loan, benefit, scholarship, or stipend at issue in the case first became due more than seven years before the filing of the bankruptcy petition excepts a debtor from the statute. Finally, evidence that nondischargeability will impose an undue hardship on debtor or debtor’s dependents provides a basis for circumventing nondischargeability. The hardship alleged, however, must be undue and attributable to truly exceptional circumstances, such as illness or the existence of an unusually large number of dependents.
 
 In re Lohman,
 
 79 B.R. 576, 581 (Bankr.D.Vt.1987).
 

 Thus far, this case has primarily traveled down the analytical path carved out by Section 523(a)(8)’s nonprofit organization provision. In the adversary proceeding conducted before the bankruptcy court, TIFCU’s principal argument for nondischargeability of Del-Bonis’s loans was that it qualified as a nonprofit organization within the meaning of 11 U.S.C. § 523(a)(8). Similarly, both the bankruptcy court and the district court, albeit with different results, focused solely on whether federal credit unions are nonprofits.
 

 A reasonable basis for assuming such an analytical tack exists, to be sure. Numerous other courts have fixed their nondischarge-ability analyses on questions pertaining to the, oftentimes, fine distinctions between nonprofit and for-profit entities. Unfortunately, a reading of their decisions suggests that no clear consensus on these questions has been reached.
 
 See In re Roberts,
 
 149 B.R. 547 (C.D.Ill.1993) (“[I]t is not disputed that the Credit Union is a nonprofit institution.”);
 
 TI Federal Credit Union v. Delbonis,
 
 183 B.R. 1, 1 (D.Mass.1995);
 
 Compare with In re Sinclair-Ganos,
 
 133 B.R. 382 (Bankr.W.D.Mich.1991) (“[T]his court holds that a credit union is not a nonprofit institution under 11 U.S.C. section 523(a)(8));
 
 and In re Simmons,
 
 175 B.R. 624 (Bankr.E.D.Va.1994) (“[T]he credit union in the case at bar is not a nonprofit institution within the scope of section 523(a)(8)”). Disagreements over whether courts should concentrate on an organization’s articulated purpose, specific financial activities, or competitiveness with other for-profit institutions in making nonprofit status determinations abound.
 
 Compare TI Federal Credit Union,
 
 183 B.R. at 1
 
 with In re Delbonis,
 
 169 B.R. 1
 
 and In re Roberts,
 
 149 B.R. at 547. Consequently, no clear test for “determining when a nonprofit institution is — or is not — a nonprofit institution under section 523(a)(8) of the Bankruptcy Code” has been formulated.
 
 In re Roberts,
 
 149 B.R. at 551;
 
 see also
 
 18 Am.Jur.2d, Corporations § 32 at 827 (“The words ‘profit’ or ‘nonprofit’ have no definite meaning or general application-”).
 

 In light of this discord, we are satisfied that the district court’s focus on whether federal credit unions are nonprofits was misplaced. Sound judicial policy counsels against deciding complicated legal issues where a clear, principled, alternative basis for reaching the same result exists.
 
 Cf. Walmac Co. v. Isaacs,
 
 220 F.2d 108, 113 (1st Cir.1955). TIFCU’s appeal of the bankruptcy court’s denial of its Motion to Amend the Agreed Statement of Fact gave the district court an opportunity to decide this case under 11 U.S.C. § 523(a)(8)’s government unit provision. That provision provides us with a principled, alternative basis for affirming the district court’s nondischargeability order.
 

 Unlike the nonprofit provision, the government unit prong of the Section 523(a)(8) is unambiguous and not particularly difficult to interpret.
 
 In re Pelkowski,
 
 990 F.2d 737, 741-42 (3rd Cir.1993). And the law establishes that federal credit unions perform important governmental purposes and operate as federal instrumentalities.
 

 IV. DISCUSSION
 

 Before addressing the substantive issues underlying our conclusion that federal credit unions are government units within the meaning of Section 523(a)(8), we must
 
 *928
 
 confront the threshold issue of whether the question of TIFCU’s status as a government unit is properly before us. We, therefore, begin our discussion by evaluating the procedural propriety of our deciding this case on that basis. The substantive issues underlying our judgment that debtor’s loans are nondischargeable will be discussed thereafter.
 

 A. Stipulations
 

 In our judicial system, “[stipulations fairly entered into are favored.”
 
 Burstein v. United States,
 
 232 F.2d 19, 23 (8th Cir.1956). Factual stipulations tend to “expedite a trial and eliminate the necessity of much tedious proof.”
 
 Id.
 
 As a result, “parties to a lawsuit are free to stipulate to factual matters.”
 
 Saviano v. Commissioner of Internal Revenue,
 
 765 F.2d 643, 645 (7th Cir.1985). They are, however, not generally free to extricate themselves from those stipulations once crafted. Due to the interest in preserving the efficiency attained through stipulations, “[t]he general rule ... [is] that stipulations of attorneys made during a trial may not be disregarded or set aside at will....”
 
 Marshall v. Emersons Ltd.,
 
 593 F.2d 565, 569 (4th Cir.1979) (citing
 
 Maryland Cas. Co. v. Rickenbaker,
 
 146 F.2d 751, 753 (4th Cir.1944));
 
 see also
 
 73 Am.Jur.2d, Stipulation § 1 (1974).
 

 Litigation stipulations can be understood as the analogue of terms binding parties to a contract. As in contract law though, rules limiting litigants to trial stipulations are not absolute.
 
 Marshall,
 
 593 F.2d at 569. Case law is clear that “a stipulation of counsel originally designed to expedite the trial should not be rigidly adhered to when it becomes apparent that it may inflict a manifest injustice upon one of the contracting parties.”
 
 Id.
 
 at 568. Parties will usually be relieved of their stipulations where it becomes evident that “the agreement was made under a clear mistake.”
 
 Brast v. Winding Gulf Colliery Co.,
 
 94 F.2d 179, 180 (4th Cir.1938).
 

 Relief from erroneous stipulations is especially favored where the mistake made concerns a legal conclusion.
 
 Saviano,
 
 765 F.2d at 645. “[P]arties may not stipulate to the legal conclusions to be reached by the court.”
 
 Id.; see also Swift & Co. v. Hocking Valley Ry. Co.,
 
 243 U.S. 281, 289-90, 37 S.Ct. 287, 289-91, 61 L.Ed. 722 (1917);
 
 O’Connor v. City and County of Denver,
 
 894 F.2d 1210, 1225-26 (10th Cir.1990) (citing
 
 Platt v. United States,
 
 163 F.2d 165, 168 (10th Cir.1947));
 
 Gunn v. United States,
 
 283 F.2d 358, 364 (8th Cir.1960);
 
 In re Dawson,
 
 162 B.R. 329, 334 (Bankr.D.Kan.1993). Issues of law are the province of courts, not of parties to a lawsuit, individuals whose legal conclusions may be tainted by self-interest. Courts, accordingly, “are not bound to accept as controlling, stipulations as to questions of law.”
 
 Estate of Sanford v. Commissioner,
 
 308 U.S. 39, 51, 60 S.Ct. 51, 60 S.Ct. 51, 59, 84 L.Ed. 20 (1939);
 
 accord Dedham Water Co., Inc. v. Cumberland Farms Dairy, Inc.,
 
 972 F.2d 453, 457 (1st Cir.1992) (citing
 
 RCI Northeast Servs. Div. v. Boston Edison Co.,
 
 822 F.2d 199, 203 (1st Cir.1987));
 
 In re Scheinberg,
 
 132 B.R. 443, 444 (Bankr.D.Kan.),
 
 aff'd,
 
 134 B.R. 426 (Bankr.D.Kan.1992).
 

 We review this appeal
 
 de novo
 
 because we are persuaded that TIFCU’s erroneous stipulation that federal credit unions are not government units concerned a matter of law, not of fact.
 
 See Compagnie De Reassurance v. New England Reinsur.,
 
 57 F.3d 56, 71 (1st Cir.1995),
 
 cert. denied,
 
 — U.S. -, 116 S.Ct. 564, 133 L.Ed.2d 564 (1995). Appellate courts review bankruptcy court findings of fact under the clearly erroneous standard, but subject legal conclusion drawn by such courts to
 
 de novo
 
 review.
 
 See Western Auto Supply Co. v. Savage Arms, Inc. (In re Savage Indus., Inc.),
 
 43 F.3d 714, 719-20, n. 8 (1st Cir.1994);
 
 In re Comer,
 
 723 F.2d 737, 739 (9th Cir.1984);
 
 see also Inwood Lab., Inc. v. Ives Lab., Inc.,
 
 456 U.S. 844, 855 n. 15, 102 S.Ct. 2182, 2189 n. 15, 72 L.Ed.2d 606 (1982) (citing
 
 United States v. Singer Mfg. Co.,
 
 374 U.S. 174, 194 n. 9, 83 S.Ct. 1773, 1784 n. 9, 10 L.Ed.2d 823 (1963));
 
 accord Cumpiano v. Banco Santander Puerto Rico,
 
 902 F.2d 148, 153 (1st Cir.1990).
 

 Whether Congress meant to include federal credit unions within the meaning of the term “government unit” has not previously been addressed by this court, but is,
 
 *929
 
 otherwise,' a garden-variety legal question, one courts are regularly called upon to answer. It primarily requires us to consider not facts, but law and various legal authorities — i.e., federal statutes; case law; and legislative history. To the extent, if at all, factual considerations enter our analytical picture, it will be only to help us reach the proper legal conclusion on the question now before us. TIFCU’s erroneous stipulation does not bind this appeal.
 

 No injustice flows from our decision to relieve TIFCU from the burden of its erroneous stipulation.
 
 See Marshall,
 
 593 F.2d at 568. Debtor’s position, admittedly, is not aided by our decision to set TIFCU’s stipulation aside. We think it fairly obvious though, that a far greater harm would be effectuated by allowing that stipulation to stand. Important federal bankruptcy and loan policies are at stake in this litigation, not merely DelBon-is’s personal financial difficulties, however unfortunate and burdensome they may be. It was error for the bankruptcy court to refuse to allow TIFCU to amend the Agreed Statement of Facts.
 

 B. Appeals and Lower Court Error
 

 Having concluded that the issue of whether federal credit unions qualify as government units under
 
 11 U.S.C.
 
 § 523(a)(8) remains an open issue, we move on to consider a second, but not unrelated, procedural question: Does the district court’s decision not to evaluate TIFCU’s appeal from the bankruptcy court's denial of its Motion to Amend the Agreed Statement of Fact preclude us from addressing that issue? The answer to this question is an unqualified no. A district court’s failure to decide an issue raised by a party and adequately supported by the facts contained in the record does not move that issue beyond an appellate court’s purview.
 
 Estate of Soler v. Rodriguez,
 
 63 F.3d 45, 53 (1st Cir.1995) (citing
 
 Willhauck v. Halpin,
 
 953 F.2d 689, 704 (1st Cir.1991)).
 

 In this circuit, “[a]n appellate court is not limited to the legal grounds relied upon by the district court, but may affirm on any independently sufficient grounds.”
 
 Id.; see also Polyplastics, Inc. v. Transconex, Inc.,
 
 827 F.2d 859, 861 (1st Cir.1987);
 
 Casagrande v. Agoritsas,
 
 748 F.2d 47, 48 n. 1 (1st Cir.1984) (per curiam). While it is axiomatic that, except in exceptional circumstances, parties may not surprise appellate courts with new issues, we do not find ourselves faced with a situation in which a party has conjured up an issue for appellate review without first presenting it to the trial court.
 
 See Johnston v. Holiday Inns,
 
 595 F.2d 890, 894 (1st Cir.1979);
 
 see also Teamsters, Chauffeurs, Warehousemen & Helpers Union, Local No. 59 v. Superline Transp. Co.,
 
 953 F.2d 17, 21 (1st Cir.1992);
 
 McCoy v. Massachusetts Institute of Technology,
 
 950 F.2d 13 (1st Cir.1991),
 
 cert. denied,
 
 504 U.S. 910, 112 S.Ct. 1939, 118 L.Ed.2d 545 (1992) (“It is hornbook law that theories not raised squarely in the district court cannot be surfaced for the first time on appeal.”). TIFCU raised the issue of its status as a government instrumentality on two separate occasions. Its effort to amend the Agreed Statement of Facts and to, thereby, correct the erroneous legal conclusion that federal credit unions are not government units, coupled with its appeal of the bankruptcy court’s denial of that motion, preserved the issue for our review.
 

 TIFCU has fulfilled its obligation to squarely raise those issues most pertinent to the resolution of its entire case.
 
 See id.
 
 We think it worth noting, however, that we would be able to reach the issue of whether federal credit unions are governmental units even if TIFCU had done nothing. Contrary to what debtor might have us believe, the rule that binds parties to their arguments is not inflexible.
 
 Johnston,
 
 595 F.2d at 894. “[A]ppellate court[s] ha[ve] discretion, in ... exceptional ease[s], to reach virgin issues.”
 
 United States v. La Guardia,
 
 902 F.2d 1010, 1013 (1st Cir.1990);
 
 United States v. Mercedes-Amparo,
 
 980 F.2d 17, 18-19 (1st Cir.1992);
 
 accord Singleton v. Wulff,
 
 428 U.S. 106, 121, 96 S.Ct. 2868, 2877-78, 49 L.Ed.2d 826 (1976);
 
 G.D. v. Westmoreland School District,
 
 930 F.2d 942, 950 (1st Cir.1991) (holding that in exceptional circumstances appellate courts may review issues of law inadequately raised at trial);
 
 United States v. Krynicki,
 
 689 F.2d 289, 291-92 (1st Cir.1982).
 

 
 *930
 
 Our recent decision,
 
 National Ass’n of Social Workers v. Harwood,
 
 69 F.3d 622, 628 (1st Cir.1995), stands for the proposition that cases involving important constitutional or governmental issues may be exceptional and, as such, there should be a full treatment of all legal issues involved, whether squarely introduced by the parties or not.
 
 See Baybank-Middlesex v. Rolar Distributors, Inc.,
 
 69 F.3d 1200, 1202 (1st Cir.1995);
 
 cf. Lebron v. Nat’l R.R. Passenger Corp.,
 
 — U.S. -, -, 115 S.Ct. 961, 965, 180 L.Ed.2d 902 (1995) (permitting a party to raise an issue it expressly disavowed and did not raise until after certiorari was granted) (“parties ... [will] not [be] limited to the precise arguments they made below”).
 
 National Ass’n of Social Workers
 
 addressed the constitutionality of Rhode Island House of Representatives Rule 45, banning “lobbyist and lobbying from the floor of the House while the House is in session....”
 
 Id.
 
 at 625. The district court held that Rule 45 violated the free speech clause of the First Amendment. We reversed the district court, holding that legislative immunity thwarted the constitutional attack, even though that issue had not previously been raised by either of the parties. We departed from the rule limiting parties to their lower court arguments because we recognized the issue presented by the case as important, “of great public moment.”
 
 Id.
 
 at 628. It implicated matters “as basic as federalism, comity, and respect for the independence of democratic institutions.”
 
 Id. National Ass’n of Social Workers
 
 makes us doubly certain of the procedural propriety of deciding this case. The present case fits squarely into the mold cast
 
 by National Ass’n of Social Workers
 
 and the cases we have deemed “exceptional” in the past.
 
 See United States v. La Guardia,
 
 902 F.2d 1010, 1013 (1st Cir.1990);
 
 United States v. Krynicki,
 
 689 F.2d 289, 291-92 (1st Cir.1982). We are convinced that a miscarriage of justice would be worked by a failure to address the governmental status of federal credit unions because the governmental issues that question implicates are so important. The continued viability of educational loan programs and the stability of federal credit unions impact the health of the national economy and the country’s educational system. As we indicated in the previous section, whether federal credit unions qualify as government units under Section 523(a)(8) is “strictly a question of law” and can be resolved on the basis of the existing record.
 
 La Guardia,
 
 902 F.2d at 1013. It requires no additional factfinding or further argument; the parties are not prejudiced in any way by the lack of another opportunity to reargue their case.
 

 We think it likely that questions about the government unit status of federal credit unions will resurface in future cases, in virtually “identical terms.”
 
 Id.
 
 The dischargeability of loans under Section 523(a)(8) continues to be a heavily litigated area. Finally, we are convinced that the result achieved by the district court was correct. And “[i]n the review of judicial proceedings ... [it] is settled that, if the decision below is correct, it must be affirmed, although the lower court relied upon a wrong ground or gave a wrong reason.”
 
 Helvering v. Gowran,
 
 302 U.S. 238, 245, 58 S.Ct. 154, 158, 82 L.Ed. 224 (1937).
 

 We can identify no legitimate reason to decline to chart the alternative course we see in this case. Additionally, we are certain that remanding at this point in the case would be a colossal waste of judicial resources.
 
 See Securities and Exchange Commission v. Chenery Corporation,
 
 318 U.S. 80, 88, 63 S.Ct. 454, 459-60, 87 L.Ed. 626 (1943). Nothing would be gained by asking the district court to reinstate its holding and to tackle a legal question which falls well within our current power to formulate.
 
 Id.
 
 Accordingly, we proceed.
 

 C. Are Federal Credit Unions Federal In-strumentalities?
 

 The term “government unit,” as employed in 11 U.S.C. § 523(a)(8), means: “United States; State; Commonwealth; District; Territory; municipality; foreign state; department, agency, or instrumentality of the United States, ... a State, a Commonwealth, a District, a Territory, a municipality, or a foreign state; or other foreign or domestic government.” 11 U.S.C. § 101. Legislative history suggests that Congress intended to “defin[e] ‘government unit’ in the broadest
 
 *931
 
 sense.” H.Rep. No. 95-595, 95th Cong., 1st Session 311 (1977), U.S.Code Cong.
 
 &
 
 Admin.News 1978, pp. 5759, 5963, 6268,
 
 reprinted in
 
 App. 2
 
 Collier on Bankruptcy,
 
 pt. II, at 311 (Lawrence P. King, ed., 15th ed. 1995). We think it evident, based on this, that 11 U.S.C. § 101 encompasses federal credit unions as federal instrumentalities, but refrain from making a categorical holding to that effect at this juncture. The legislative history indicates that Congress meant to temper its exhortation to define broadly. According to that history, we must demonstrate that federal credit unions have an active relationship with the federal government, that they carry out some governmental function.
 
 Id. “
 
 ‘[I]nstrumentality' does not include entities that owe their existence to State action such as the granting of a charter or a license, but that have no other connection with a State or local government or the Federal Government.
 
 Id.
 

 Whether federal credit unions are federal instrumentalities, thus, depends on the types of functions such organizations perform. We are aware of no settled process for assessing the governmental character of a particular function or service. In the area of federal instrumentality decisions, we lack the advantage of any bright line rules or tests.
 
 Federal Reserve Bank of Boston v. Comm’r of Corporations and Taxation,
 
 499 F.2d 60, 64 (1st Cir.1974);
 
 see also United States v. Michigan,
 
 851 F.2d at 806
 
 (citing Dep’t of Employment v. United States,
 
 385 U.S. 355, 358-59, 87 S.Ct. 464, 467, 17 L.Ed.2d 414 (1966) (“[T]here is no simple test for ascertaining whether an institution is so closely related to government activity as to become a tax-immune instrumentality”)). As a result, we rest our decision on a combination of statutory interpretation, case law, and consideration of the factors relevant to federal instrumentality determinations.
 

 Perhaps the most “significant factor in determining whether a particular entity is a federal instrumentality is whether it performs an important government function.”
 
 United States v. Michigan,
 
 851 F.2d 803, 806 (6th Cir.188);
 
 see also Federal Land Bank v. Bismarck Lumber Co.,
 
 314 U.S. 95, 62 S.Ct. 1, 86 L.Ed. 65 (1941). In response to devastating Depression era losses — failed banks; high interest rates; diminished credit opportunities — Congress created scores of federal organizations and corporations designed to stabilize the national economy and pursue other governmental ends.
 
 See generally Lebron,
 
 — U.S. at--, 115 S.Ct. at 969-71 (detailing the history of federal corporations in the United States and explaining that even the denial of federal instrumentality status in enabling legislation is not dispositive in federal instrumentality determinations);
 
 see also Reconstruction Finance Corporation,
 
 306 U.S. at 391, n. 3, 59 S.Ct. at 518-19, n. 3 (listing federal credit unions among a list of forty corporations Congress provided to discharge governmental functions). As part of this rehabilitative effort, the Congress created federal credit unions by enacting the Federal Credit Union Act, 12 U.S.C. 1751
 
 et seq.,
 
 in 1934.
 

 The express purpose of the Federal Credit Union Act, articulated in its long title, was: “[T]o establish a Federal Credit Unions System, to establish a further market for securities of the United States and to make more available to people of small means credit for provident purposes through a national system of cooperative credit, thereby helping to stabilize the credit structure of the United States.” 12 U.S.C. § 1751,
 
 reprinted in
 
 Credit Union National Association, Inc.,
 
 Legislative History of the Federal Credit Union Act: A Study of the Historical Development From 1931 to 1980 of the Statute Governing Federal Credit Unions;
 
 ”
 
 see also Branch Bank & Trust v. Nat’l Credit Union Admin. Bd.,
 
 786 F.2d 621, 625-26 (4th Cir.1986),
 
 cert. denied,
 
 479 U.S. 1063, 107 S.Ct. 948, 93 L.Ed.2d 997 (1987). In effect, the Federal Credit Union Act created a localized and liberalized system of federal credit services. It modeled that system on the strong network of state and local credit unions already established at the time. That network started functioning in the early twentieth century, with the occurrence of two important events, the founding of the first United States-based credit union, La Caisse Populaire, in 1908 and the enactment of the first comprehensive credit union statute, the Massachusetts Credit Union Act, Mass.Gen.L. ch. 171, § 1
 
 et seq.,
 
 in 1909.
 
 See La Caisse Populaire,
 
 
 *932
 
 563 F.2d at 505; J. Moody and G. Fite,
 
 The Credit Union Movement: Origins and Development 1850 to 1980
 
 19-31 (2d ed. 1984).
 

 This history demonstrates that federal credit unions were intended to perform a variety of governmental functions. Our research establishes that they still do. Federal credit unions enable the federal government to make credit available to millions of working class Americans. These organizations, often described as “cooperative association^] organized ... for the purpose of promoting thrift among [their] members and creating a source of credit for provident or productive purposes,” 12 U.S.C. § 1752, provide credit at reasonable rates to millions of individuals who — because they lack security or, as recent studies show, reside in low income areas or in communities primarily inhabited by racial minorities — would otherwise be unable to acquire it.
 
 Cf. United States v. Michigan,
 
 851 F.2d at 806;
 
 see also Federal Credit Union Handbook,
 
 at iii; Anthony D. Taibi,
 
 Banking, Finance, and Community Economic Empowerment: Structure, Economic Theory, Procedural Civil Rights, and Substantive Racial Justice,
 
 107 Harv.L.Rev. 1463 (1994) (describing impact of redlining and credit discrimination on local communities). Because large financial entities generally refuse to extend credit to individuals without traditionally accepted forms of collateral, entities offering usurious interest rates are too often the only other viable source of credit for many working class people.
 
 See Branch Bank & Trust,
 
 786 F.2d at 621 (outlining formation of credit unions in response to entities offering usurious rates).
 

 Nevertheless, the functions performed by federal credit unions are not limited to broadening the availability of credit in the United States. Federal credit unions are authorized to perform many other governmental functions. To begin, the Federal Credit Union Act authorizes-them to issue loans and dividends to their members. 12 U.S.C. § 1757;
 
 see also
 
 12 U.S.C. § 1763. It also authorizes federal credit unions to invest their funds in obligations of the United States; invest in securities; or make deposits in national banks.
 
 Id.
 
 Indeed, federal credit unions serve as fiscal agents of the United States and depositories for public monies.
 
 United States v. Maine,
 
 524 F.Supp. at 1059;
 
 see also United States v. Michigan,
 
 635 F.Supp. 944, 947 (W.D.Mich.1985),
 
 aff'd,
 
 851 F.2d 803 (6th Cir.1988); 12 U.S.C. § 1767(a) (“Each Federal credit union organized under this chapter ... shall act as fiscal agent of the United States ... [and] [a]ny Federal credit union ... shall be a depository of public money_”).
 

 Such functions have properly been regarded as important governmental functions by other courts. In
 
 Smith v. Kansas City Title & Trust Co.,
 
 255 U.S. 180, 41 S.Ct. 243, 65 L.Ed. 577 (1921), the United States Supreme Court acknowledged that employment as a fiscal agent of the United States and service as a depository for public monies fulfilled important government purposes. 255 U.S. at 209-11, 41 S.Ct. at 248-49.
 
 Smith
 
 exempted farm loans from state taxation because of the governmental functions federal land banks performed and, concomitantly, held that Congress acted within its constitutional authority when it enacted the Federal Farm Loan Act, 39 Stat. 360, as amended by Jan. 18, 1918, 40 Stat. 431. The Farm Loan Act established federal land banks and joint-stock land banks.
 
 Id.
 

 In the two decades following the
 
 Smith
 
 decision, the Court held that federal land banks operated as government instrumentalities on three separate occasions.
 
 See Federal Land Bank of Columbia, S.C. v. Gaines,
 
 290 U.S. 247, 54 S.Ct. 168, 78 L.Ed. 298 (1933);
 
 Federal Land Bank of St. Louis v. Briddy,
 
 295 U.S. 229, 55 S.Ct. 705, 79 L.Ed. 1408 (1935); and
 
 Federal Land Bank of St. Paul v. Bismarck Lumber Co.,
 
 314 U.S. 95, 62 S.Ct. 1, 86 L.Ed. 65 (1941). In
 
 Federal Land Bank of St. Paul v. Bismarck Lumber Co.,
 
 314 U.S. 95, 62 S.Ct. 1, 86 L.Ed. 65 (1941), the Court explained the reasons for this conclusion and emphasized that federal land banks performed the important governmental purpose of extending credit, at low interest rates, to farm borrowers. 314 U.S. at 100, 62 S.Ct. at 4. Federal credit unions indisputably provide a similar service and reach, by definition, a much “broader cross-section of the nation’s citizens.”
 
 United States v. Michigan,
 
 851 F.2d at 806.
 

 
 *933
 
 More recently, in 1988, the Sixth Circuit embraced the Supreme Court’s conclusions about the governmental importance of extending credit, functioning as a fiscal agent of the United States, and extending credit at low interest rates. In
 
 United States v. Michigan,
 
 851 F.2d 803 (6th Cir.1988), the Sixth Circuit found that federal credit unions are government instrumentalities precisely because they perform such functions. 851 F.2d at 806-07. The court explained that, “[b]e-cause of the important governmental functions performed by federal credit unions, ... we hold that federal credit unions are federal instrumentalities.”
 
 Id.
 
 at 807. The court then went on to hold that the Supremacy Clause and 12 U.S.C. § 1768 immunize federal credit unions from state taxation.
 
 Id.; see also United States v. Maine,
 
 524 F.Supp. 1056 (D.Me.1981) (holding that state tax on federal credit unions violated the Supremacy Clause and the Federal Credit Unions Act because federal credit unions are federal instrumentalities).
 

 We appreciate, as debtor pointed out below, that private institutions deliver many of the services performed by federal credit unions. In the more than sixty years since the Federal Credit Union Act’s passage, federal credit unions have, undeniably, increased in number and significantly expanded the services they provide. Today, these institutions offer an increasingly complicated and complex array of financial services.
 
 United States v. Michigan,
 
 851 F.2d at 805;
 
 see generally Federal Credit Union Handbook, supra
 
 at 11-14.
 

 We firmly reject, however, debtor’s argument that this fact militates against a finding in TIFCU’s favor. That federal credit unions now have the capacity to compete on quasi-equal footing with other financial institutions does not alter our conclusion that they perform a predominantly governmental purpose. We echo the district court’s insight that “the extent to which a federal credit union resembles a bank should [not] be determinative of the issue before the court.”
 
 TI Federal Credit Union,
 
 183 B.R. at 4. We also note that internal characteristics, such as limitations on membership and location, distinguish federal credit unions from proprietary institutions such as banks. Banks, with few exceptions, may do business wherever and with whomever they wish. Federal credit unions, in contrast, must limit their memberships and, therefore, business operations, to “groups having a common bond of occupation or association, or to groups -within a well-defined neighborhood, community, or rural district.” 12 U.S.C. § 1759.
 

 Finally, we, like our colleagues on the Sixth Circuit, find two additional features federal credit unions share conclusive — tax exemption and governmental regulation. Congress, in exempting federal credit unions from federal income taxation, has expressed the view that federal credit unions serve several unique governmental purposes and are, therefore, different from banks. Section 501(c)(1)(A) of the Internal Revenue Code provides an exemption for “[a]ny corporation organized under Act of Congress which is an instrumentality of the United States ... if such corporation is exempt from Federal income taxes under such Act as amended and supplemented before July 18, 1984....” 26 U.S.C. section 501(e)(1)(A)(i). Because the Federal Credit Union Act expressly provides federal credit unions an exemption from federal, as well as state, territorial, or local taxation, federal credit unions fall within the parameters of this provision.
 
 Cf. La Caisse,
 
 563 F.2d at 509;
 
 see
 
 12 U.S.C. § 1768; see
 
 also
 
 Rev.Rul. 55-133,
 
 superseded by
 
 Rev.Rul. 60-169 (“Federal credit unions are recognized as instrumentalities of the United States within the meaning of section 501(c)(1) of the Internal Revenue Code”); Rev.Rul. 60-169 (“Federal Credit Unions organized and operated in accordance with the Federal Credit Union Act are recognized as instrumentalities of the United States within the meaning of section 501(c)(1) of the Code”); Bruce R. Hopkins,
 
 The Law of Tax-Exempt Organizations
 
 323-24, n. 1 (1983).
 

 This tax exemption strengthens our view that Congress regards federal credit unions in a special light. By this, we do not mean to suggest that a necessary correlation exists between federal instrumentality status and tax exemption. The Internal Revenue Code itself belies the value in drawing such an inference, for it also provides an exemption
 
 *934
 
 for state credit unions under Section 501. Yet, such entities clearly are not federal in-strumentalities.
 

 The manner in which Congress exempted federal credit unions from taxation is,- however, significant. Congress did not treat federal and state credit unions alike; it addressed federal and state credit unions in entirely different sections of the Internal Revenue Code.
 
 La Caisse,
 
 563 F.2d at 509. State credit unions are exempted under Section 501(c)(14), whereas, federal credit unions are exempted under Section 501(c)(1).
 
 Id.
 
 Section 501(c)(14), unlike Section 501(c)(1), neither mentions federal instrumentalities nor draws a direct relationship between the federal government and the services provided by state credit unions. These aspects of the tax exemption federal credit unions receive support our belief that Congress regards federal credit unions as federal instrumentalities.
 

 The imprimatur Congress places on-federal credit unions by way of tax exemption is not the only additional feature which convinces us of federal credit unions’ special status. Extensive government regulation further distinguishes federal credit unions from ordinary proprietary organizations. The NCUA administers programs and promulgates regulations for credit union chartering, membership, and governance in accordance with the Administrative Procedure Act, 5 U.S.C.A. § 551
 
 et seq. See
 
 12 U.S.C. § 1752a;
 
 see also
 
 12 C.F.R. §§ 701.1, 708, 709, 710; National Credit Union Administration,
 
 Chartering and Field of Membership Manual
 
 (1994). It promulgates regulations concerning credit practices, 12 C.F.R. Part 706; dissemination of savings program information, 12 C.F.R. §§ 707.1-707.6; payment of dividends, 12 C.F.R. § 707.7; and
 
 inter alia,
 
 insurance and group purchasing plans, 12 C.F.R. Part 721. Finally, not unlike other executive branch agencies, the NCUA issues revised rulings which provide guidance to credit unions operating in the field.
 
 See
 
 12 C.F.R. Ch. VII (1-1-95 Edition).
 

 The decentralized system in which federal credit unions operate does not minimize the significance of NCUA’s regulatory acts, the weight to be accorded the Federal Credit Union Act’s careful delineation of federal credit union powers, or the significance of the other statutes governing federal credit union activities.
 
 See e.g.
 
 Truth in Lending Act, 15 U.S.C. § 1601
 
 et seq.;
 
 Equal Credit Opportunity Act, 15 U.S.C. § 1601
 
 et seq.;
 
 Fair Credit Reporting Act, 15 U.S.C. § 1681
 
 et seq.;
 
 Home Mortgage Disclosure Act, 12 U.S.C. § 2801; and the Fair Debt Collection Practices Act, 15 U.S.C. § 1692
 
 et seq.
 
 Federal credit unions do not,
 
 a fortiori,
 
 wield powei’s akin to those employed by banks because they are member-owned and authorized, through their individual boards of directors, to develop guidelines for their operation or independently make decisions about the services they provide.
 
 Cf. United States v. California Bd. of Equalization,
 
 2 Ca.State Tax Rep. (CCH), ¶ 400-071,
 
 aff'd,
 
 709 F.2d 1518 (9th Cir.1983). Any suggestion that they do misses, what the Supreme Court, in
 
 Federal Land Bank v. Bismark,
 
 314 U.S. 95, 62 S.Ct. 1, 86 L.Ed. 65 (1941) regarded as a fundamental point: “[t]he federal government is one of delegated powers, and from that it necessarily follows that any constitutional exercise of its delegated powers is governmental.” 314 U.S. at 102, 62 S.Ct. at 5. We refuse to penalize federal credit unions for successfully performing the governmental functions assigned them. And, therefore, we find that increases in the number of federal credit unions and improvements in federal credit union services indicate that the Federal Credit Union Act’s goal of providing credit at reasonable rates is being met.
 
 See United States v. Michigan,
 
 851 F.2d at 806.
 

 We hold, moreover, that performance of governmental functions, exemption from federal tax, and extensive government regulation are compelling indicia of federal instrumentality status. In the past, such factors have persuaded this court to make a finding of government instrumentality status. In
 
 Federal Reserve Bank of Boston v. Comm’r of Corporations and Taxation of the Commonwealth of Massachusetts,
 
 499 F.2d 60 (1st Cir.1974), for example, we recognized federal reserve banks as federal instrumentalities on the basis of characteristics shared, in large part, by federal credit unions. Two characteristics of federal credit unions, acting as a depository for public monies and serving
 
 *935
 
 as a fiscal agent of the United States, figured prominently in our analysis. 499 F.2d 60, 62.
 

 Similarly, in
 
 United States v. State Tax Comm’n,
 
 481 F.2d 963 (1st Cir.1973), we concluded that federal savings and loans associations are federal instrumentalities. 481 F.2d at 969;
 
 see also Federal Reserve Bank of Boston,
 
 499 F.2d at 62. That case, like
 
 Federal Reserve Bank of Boston
 
 and many of the other cases involving questions of federal instrumentality status, concerned the validity of state taxes imposed on federal entities.
 
 See, e.g., United States v. Michigan,
 
 851 F.2d at 803;
 
 Keifer and Keifer v. Reconstruction Finance Corp.,
 
 306 U.S. 381, 390 n. 3, 59 S.Ct. 516, 518-19 n. 3, 83 L.Ed. 784 (1939);
 
 United States v. Maine,
 
 524 F.Supp. at 1056;
 
 United States v. California Bd. of Equalization,
 
 2 Ca.State Tax Rep. (CCH), ¶ 400-071,
 
 aff'd,
 
 709 F.2d at 1518. We held that a Massachusetts tax imposed an impermissible burden on federal savings and loans because it provided a deduction for governmental institutions that were very similar to federal loan associations, but not for federal credit loan associations themselves. 481 F.2d at 963. In reaching our decision that such organizations are federal instrumentalities, we noted that federal savings and loans are federally created banks, chartered and regulated by an executive branch entity, the Federal Home Loan Board, and that “they serve the statutory purpose of providing ‘local mutual thrift institutions in which people may invest their funds and ... for the financing of homes, ... [a] purpose ... said to affect the welfare of the nation as a whole.” 481 F.2d at 967-78. Federal credit unions have similar characteristics and purposes.
 

 In
 
 United States v. State Tax Comm’n,
 
 we, admittedly, indulged the argument that credit unions and federal savings and loans can be distinguished. But, few, if any, inferences can be drawn from our recognition of such distinctions because
 
 United States v. State Tax Comm’n
 
 involved state, not federal, credit unions. State credit unions are altogether different entities; unlike federal credit unions, they are neither chartered under the Federal Credit Union Act, nor regulated by the NCUA.
 

 It does not, of course, follow that no differences between federal credit unions and federal savings institutions exist. The United States Supreme Court has itself held that federal credit unions and federal loan associations are “far from identical.”
 
 First Federal Sav. and Loan Ass’n of Boston v. State Tax Comm’n,
 
 437 U.S. 255, 260, 98 S.Ct. 2333, 2336, 57 L.Ed.2d 187 (1978). The basis for its holding, however, rested on the assumption that federal credit unions are more closely tied to the government and its functions than federal loan associations, not less. As the Court noted when it considered some of the same issues we addressed in
 
 United States v. State Tax Comm’n:
 
 Congress has “long treated federally chartered credit unions differently [and more favorably than] ... federally chartered savings and loan associations.” 437 U.S. at 260, 98 S.Ct. at 2337. This special treatment is evident in the tax exemptions exclusively afforded federal credit unions and insurance programs designed to protect federal credit union deposits.
 

 We think it plain that federal credit unions are, as a general matter, federal instrumentalities. Our statement in
 
 Northeast Federal Credit Union v. Neves,
 
 837 F.2d 531 (1st Cir.1988), that federal credit unions are not federal agencies does not detract from this conclusion. The principles addressed in that case are not directly relevant here. Furthermore, we make no effort to liken federal credit unions to government agencies; we are persuaded only that they are government instrumentalities, lesser in scope and in responsibility than actual government agencies.
 

 D. Is Treating TIFCU As A Governmental Unit Consistent With the Purposes of the Statute?
 

 Our analysis in this case does not end with our conclusion that federal credit unions are government instrumentalities. We must still resolve whether treating federal credit unions as federal instrumentalities and, thus, as government units, is consistent with the purposes of 11 U.S.C. section 523(a)(8). Each instrumentality must be examined in “light of its governmental role and the wishes of Congress as expressed in rele
 
 *936
 
 vant legislation.”
 
 Federal Reserve Bank of Boston,
 
 499 F.2d at 64.
 

 It is undisputed that Section 523(a)(8) was enacted to prevent abuses in student loan programs.
 
 In re Pelkowski,
 
 990 F.2d at 742. Its history, which begins in 1976 with its precursor, Section 439A of the Education Amendments of 1976, reflects a congressional intent to minimize the opportunities to use bankruptcy as a way of avoiding repayment of student loan debts.
 
 Id.
 
 Section 439A, which limited the dischargeability of only guaranteed or insured educational loans, was enacted after the 1973 Commission on the Bankruptcy Laws of the United States described the incidence of debtors attempting to discharge educational loan debts in bankruptcy as “reprehensible” and a “threat to the continuance of educational loan programs.” H.R.Doc. No. 93-137, 93d. Cong., 1st Sess., Pts. I and II (1973),
 
 reprinted in
 
 App. 2
 
 Collier,
 
 pt. I, at 176-77;
 
 see also
 
 Jerome M. Organ,
 
 Good Faith and the Discharge of Educational Loans in Chapter 13: Forging A Judicial Consensus,
 
 38 Vand.L.Rev. 1087, 1093-97 (1985).
 

 Section 439A was later reconsidered by the House Subcommittee on Civil and Constitutional Rights, but the nondischargeability policy contemplated nevertheless became part of the Bankruptcy Reform Act of 1978 through an amendment made to H.R. 8200.
 
 In re Pelkowski,
 
 990 F.2d at 742. Representative Allen Ertel introduced the amendment which eventually became Section 523(a)(8), noting that defaults and delinquencies in federal student loan programs increased by more than three hundred percent between 1972 and 1976. H.R. No. 95-595, 95th Cong. 1st Session (1977), U.S.Code Cong. & Admin.News 1978, p. 5759, 5963,
 
 reprinted in
 
 App. 2
 
 Collier,
 
 pt. II, at 537. Representative Ertel explained:
 

 [T]hese bankruptcies could easily destroy the federal student loan programs.... This problem cannot be permitted to spread nationwide, because destruction of the student loan programs would operate to deny the benefits of higher education to many would-be students who are otherwise qualified for post-high school education or training.... The destruction of student loan programs would represent a tremendous waste of one of this nation’s greatest assets, the minds and skills of American youth.
 

 Id.
 
 Representative Ertel’s statements are noteworthy, though admittedly not conclusive of Congress’ intent,
 
 In re Pelkowski,
 
 990 F.2d at 743
 
 (citing Consumer Prod. Safety Comm’n v. GTE Sylvania, Inc.,
 
 447 U.S. 102, 118, 100 S.Ct. 2051, 2061, 64 L.Ed.2d 766 (1980)), because they were supported by a number of legislators.
 
 Id.
 
 at 742-43. Both Senator DeConcini and Representative Edwards mentioned the amendment on the floor of their respective chambers.
 
 See id.
 
 at 742. On the House floor, Representative Edwards also explained that “Section 523(a)(8) represents a compromise between the House bill and the Senate amendment regarding educational loans.” 124 Cong.Rec. p. H 11096,
 
 reprinted in
 
 App. 3
 
 Collier on Bankruptcy,
 
 pt. IX, at 101. Representative Edwards went on to clarify that Section 523(a)(8) would only make educational loans issued by governmental units or nonprofits nondis-chargeable and that it would broaden the bankruptcy laws in effect at the time by extending coverage to non-federally insured loans.
 
 Id.
 

 In its original form, Section 523(a)(8) only referred to loans acquired from a “governmental unit, or a nonprofit institution of higher education for an educational loan.” Bankruptcy Reform Act of 1978, Pub.L. No. 95-598, 92 Stat. 2549 (1978);
 
 see also In re Segal,
 
 57 F.3d 342 (3rd Cir.1995). This version of the subsection, however, was short-lived. Congressional efforts to limit the dis-chargeability of educational loans by expanding the types of loans or institutions covered by Section 523(a)(8) continued after 1978. Amendments made in 1979 rewrote Section 523(a)(8) to include “educational loan[s] made, insured, or guaranteed by a government unit or made under any program funded in whole or in part by a governmental unit or a nonprofit institution of higher education”. Act of August 14, 1979, Pub.L. No. 96-56, § 3(1), 93 Stat. 387 (1989) (amending 11 U.S.C. § 523(a)(8) (1979)).
 

 In 1984, the Bankruptcy Amendment Act of 1984 struck the phrase “of higher edu
 
 *937
 
 cation,” from Section (a)(8). P.L. 98-358, section 454(a)(2). This extended the provisions of that section to all nonprofit loan programs, not merely those associated with an institution of higher education. When read together, the 1979 and 1984 amendments made nondischargeable loans issued pursuant to an educational loan program operated by a nonprofit organization or a governmental unit and educational loans acquired from a commercial financial institution, if such loans were insured by a governmental unit.
 
 See In re Segal,
 
 57 F.3d 342, 346 (3rd Cir.1995).
 

 Amendments made in 1990, by the Crime Control Act of 1990, altered Section 523(a)(8) yet another time. They expanded nondischargeability to encompass educational loans, as well as educational benefit overpayments and obligations to repay funds received as an educational benefit, scholarship or stipend. Crime Control Act of 1990, Pub.L. 101-647, § 3621(1), 104 Stat. 4964-4965 (1990) (amending 11 U.S.C. § 523(a)(8) (1984)). The 1990 Amendment also made it more difficult for debtors to take advantage of the exceptions to nondisehargeability. It increased from five to seven the number of years which must have elapsed between the date an exception seeking debtor’s loans first became due and the filing of the bankruptcy petition.
 
 Id.
 
 at section 3621(2).
 

 Viewed against the backdrop of the Bankruptcy Code as a whole, Section 523(a)(8) and the amendments made to it are aberrations from the norm. Congress drafted the Bankruptcy Code to effectuate the “general purpose of providing debtors with ‘a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt.’”
 
 In re Alibatya,
 
 178 B.R. 335, 337 (E.D.N.Y.1995)
 
 (quoting Local Loan Co. v. Hunt,
 
 292 U.S. 234, 54 S.Ct. 695, 78 L.Ed. 1230 (1934)). The Code, thus, was intended to be a mechanism for liberal discharge of debt. Even Chapter 7, the Code section under which debtor currently seeks relief, reflects that purpose by entitling debtors to “a discharge of all debts except obligations ... specifically except[ed] from discharge.” Jerome M. Organ,
 
 “Good Faith” and the Discharge of Educational Loans in Chapter 13: Forging A Judicial Consensus,
 
 38 Vand.L.Rev. 1087, 1093 (1985);
 
 see also
 
 11 U.S.C. § 727(b). Section 523(a)(8), in contrast, departs significantly from the liberal dischargeability policy manifested in the bankruptcy laws.
 
 In re Alibatya,
 
 178 B.R. 335, 337 (E.D.N.Y.1995). From its inception, it has operated as a limit on code sections such as Chapter 7, primarily on the theory that the there are some instances in which a creditor’s interest in recovering full payment of debts outweighs the debtor’s interest in a complete fresh start.
 
 See Grogan v. Garner,
 
 498 U.S. 279, 287, 111 S.Ct. 654, 659-60, 112 L.Ed.2d 755 (1991). Thus, whereas the Bankruptcy Code focuses on the impact financial problems have on individual debtors, Section 523(a)(8) concentrates on the impact individual debtor’s have on future educational debtors and institutional creditors, particularly unsecured creditors like TIFCU.
 
 Cf. In re Alibatya,
 
 178 B.R. at 337. Section 523(a)(8) sends the clear message that the interest in ensuring the continued existence and operation, the educational loan programs of government units and nonprofit organizations supersedes the interest in minimizing the financial difficulties of individual debtors.
 
 See id.; In re Merchant,
 
 958 F.2d 738, 740 (6th Cir.1992). Its purpose, essentially, is to preclude certain educational loan debtors from taking unfair advantage of the Code’s “fresh start” policy.
 
 In re Lohman,
 
 79 B.R. 576, 580 (Bankr.D.Vt.1987).
 

 We are convinced that treating federal credit unions as “government instrumentalities” and, thus, “government units,” is consistent with Section 523(a)(8)’s discharge-limiting purpose. “By enacting Section 523(a)(8), Congress sought principally to protect government entities and nonprofits— places which lend money or guarantee loans to individuals for educational purposes — from bankruptcy discharge.”
 
 In re Segal,
 
 57 F.3d at 348. Including federal credit unions within the universe of entities regarded as government units under Section 523(a)(8), in accord with this purpose, reduces opportunities for dischargeability and minimizes opportunities for fraud.
 

 Without imputing any fraudulent intent to DelBonis, we point out that narrowly con
 
 *938
 
 struing the term “government unit” to exclude federal credit unions would create a perverse incentive for educational debtors. A definition of “government unit” which excludes federal credit unions would encourage debtors to circumvent nondischargeability provisions by taking all their school loans out with federal credit unions or, as in the present case, having a family member do so. Educational loan programs could be decimated by this and millions of students, individuals probably not unlike the members of debt- or’s family who benefitted from his dealings with TIFCU, would ultimately be precluded from pursuing opportunities in higher education.
 
 See
 
 H.R. No. 95-595, 95th Cong. 1st Session (1977), U.S.Code Cong. & Admin.News 1978, pp. 5759, 5963,
 
 reprinted in
 
 App. 2
 
 Collier,
 
 pt. II, at 537 (Remarks of Representative Ertel).
 

 This result clearly would be in conflict with the legislative goals manifested in Section 523(a)(8). And we note, though it does not bear directly on our interpretation of Section 523(a)(8), that it would undermine the Federal Credit Union Act as well. One of the Federal Credit Union Act’s primary goals is to “make more available to people of small means credit for provident purposes.” 12 U.S.C. § 1751
 
 et seq.
 
 Allowing educational loans issued by federal credit unions to be freely discharged in bankruptcy could devastate many federal credit unions. Because loans comprise the major part of the federal credit union investments, it would drastically decrease opportunities for working class people to obtain credit. Federal credit unions, as mutual thrift institutions, rely on members like DelBonis to repay the debts they accrue, even if those debts are incurred on behalf of a non-member relative.
 
 Cf. In re Wilcon,
 
 143 B.R. 4 (D.Mass.1992) (holding Section 523(a)(8) includes debt of parent taken out on behalf of a child).
 

 We think it extremely unlikely that Congress ascribed a meaning to “government unit” which would frustrate not one, but two of its legislative enactments. Therefore, we hold that, federal credit unions are government units within the purpose and meaning of 11 U.S.C. § 523(a)(8). Absent the applicability of one or both of Section 523(a)(8)’s exceptions, the loans debtor obtained from TIFCU are nondischargeable. This case is remanded to the bankruptcy court for a determination of whether either of the exceptions to Section 523(a)(8) nondischargeability are applicable in this case.