# FIRST FEDERAL SAVINGS & LOAN ASSOCIATION OF BOSTON ET AL. *v.* TAX COMMISSION OF MASSACHUSETTS ET AL.

No. 77–334.   Argued March 21, 1978—Decided June 15, 1978

Stevens, J., delivered the opinion of the Court, in which Burger, C. J., and Brennan, Stewart, White, Marshall, Powell, and Rehnquist, JJ., joined. Blackmun, J., filed an opinion concurring in part and dissenting in part, *post*, p. 263.

*Chester M. Howe* argued the cause for appellants. With him on the briefs was *Maxwell D. Solet.*

*S. Stephen Rosenfeld,* Assistant Attorney General of Massachusetts, argued the cause for appellees. With him on the brief were *Francis X. Bellotti,* Attorney General, and *John E. Bowman, Jr.,* and *Margot Botsford,* Assistant Attorneys General.*

Mr. Justice Stevens delivered the opinion of the Court.

This appeal challenges the power of the State of Massachusetts to impose a tax on federal savings and loan associations. Relying on a federal law forbidding States to tax federal associations more heavily than "similar" state institutions, appellants contend that the State's tax discriminates against federal associations because: (1) the state institutions subject to the tax are allowed a larger deduction for required additions to reserves than federal associations, and (2) the state tax does not apply to credit unions, which appellants believe to be "similar" to federal savings and loan associations.

In the Home Owners' Loan Act of 1933, Congress authorized the creation of federally chartered savings and loan associations. 48 Stat. 128. Section 5 (h) of that Act, as amended, 76 Stat. 984, 12 U. S. C. § 1464 (h) (1976 ed.), provides:

"No State, county, municipal, or local taxing authority

---

*Solicitor General McCree, Assistant Attorney General Ferguson, Stuart A. Smith,* and *David English Carmack* filed a brief for the United States as *amicus curiae* urging reversal.

shall impose any tax on such associations or their franchise, capital, reserves, surplus, loans, or income greater than that imposed by such authority on other similar local mutual or cooperative thrift and home financing institutions."

As enacted in 1966, the Massachusetts statute imposed an excise tax, measured by deposits and income, on state cooperative banks, state savings banks, and state and federal savings and loan associations. 1966 Mass. Acts, ch. 14, § 11. In 1973, the deposits aspect of the tax was invalidated as discriminatory. *United States* v. *State Tax Comm'n,* 481 F. 2d 963 (CA1 1973). See n. 3, *infra.* The present case, brought in state court in 1975, challenges the income aspect of the tax. It was presented on stipulated facts to the Supreme Judicial Court of Massachusetts, which upheld the statute. 372 Mass. 478, 363 N. E. 2d 474 (1977). We affirm.

I

The state tax statute allows a financial institution to deduct from its taxable income any "minimum additions . . . to its guaranty fund or surplus required by law or the appropriate federal and state supervisory authorities." Mass. Gen. Laws Ann., ch. 63, § 11 (*b*) (West Supp. 1977). As might be expected, the reserves required by state and federal regulators are not precisely the same. Before 1970, each federal association was required to adopt a charter providing for a minimum reserve equal to 10% of the association's capital. See 12 CFR § 544.1 (1977). This reserve was as large as, or larger than, the reserves that Massachusetts required its institutions to maintain.[1] In 1970, federal associations were allowed

---

[1] Massachusetts savings banks must set aside 7½% of deposits. Mass. Gen. Laws Ann., ch. 168, § 58 (West 1971). State cooperative banks must reserve 10% of their assets. Ch. 170, § 38. The reserve requirement for state savings and loan associations is not spelled out by statute. Cf. ch. 93, § 34 (West Supp. 1977).

to delete the reserve provision from their charters, a change that dropped their reserve requirement to 5% of checking and savings account balances.   35 Fed. Reg. 4044 (1970); 12 CFR §§ 544.8 (c)(1), 563.13 (1977); 12 U. S. C. § 1726 (b) (1976 ed.).   More than three-quarters of the federal associations in Massachusetts adopted the change within a few months of the new regulation, and all but four have now amended their charters.   The new requirement is lower than those set for state institutions.   For this reason, the federal associations argue, their tax deductions are smaller than those of state institutions; they contend that this disparity in deductions is the sort of discrimination that has been proscribed by federal law.

Section 5 (h) of the Home Owners' Loan Act of 1933 "unequivocally bars discriminatory state taxation of the Federal Savings and Loan Associations."   *Laurens Federal Savings & Loan Assn.* v. *South Carolina Tax Comm'n,* 365 U. S. 517, 523.   It is one of several laws passed by Congress to protect federally chartered financial institutions from "unequal and unfriendly competition" caused by state tax laws favoring state-chartered institutions.[2]   On its face, however, Massachusetts' tax scheme is not unfriendly or discriminatory.   It applies a single neutral standard to state and federal institutions alike.   The amount of the deduction depends on varying regulatory practices, but a tax is not invalid because it recognizes that state and federal regulations may differ.   There is no reason to believe that § 5 (h) was intended to force state and federal regulation into the same mold.[3]

_____

[2] *Mercantile Bank* v. *New York,* 121 U. S. 138, 155.   See 12 U. S. C. § 548 (1976 ed.) (national banks); 12 U. S. C. § 627 (1976 ed.) (corporations federally authorized to engage in foreign banking).

[3] Indeed, the federal statute protects federal associations from being forced into the state regulatory mold.   The deposits aspect of the tax was invalidated partly because its apparently neutral provisions were

Notwithstanding its neutral language, the federal associations argue that the tax is discriminatory in fact. They have not, however, established that it is unfairly burdensome in "practical operation." *Michigan Nat. Bank* v. *Michigan,* 365 U. S. 467, 476. The record does not indicate that federal associations have suffered a significant handicap in competing with state institutions, or that any other federal policies have been thwarted.[4] The lower reserve requirement, by making more funds available for dividends, may well give the associations a competitive advantage, despite the tax. Certainly the associations' rush to amend their charters in 1970 lends support to that conclusion. Any suggestion of discriminatory purpose

calculated to impose state regulatory requirements on federal associations. The statute permitted an institution to take a deduction for loans secured by out-of-state real estate but only if the property was within 50 miles of the institution's home office. Mass. Gen. Laws Ann., ch. 63, § 11 (West Supp. 1977). This limit reflected state restrictions on making out-of-state loans more than 50 miles from the home office. *United States* v. *State Tax Comm'n,* 481 F. 2d 963, 968–969, n. 6 (CA1 1973). But federal associations are empowered by federal law to make such loans up to 100 miles from home. 12 U. S. C. § 1464 (c) (1976 ed.). By treating the state and federal institutions as though they were subject to the same regulatory limits, the statute exacted a higher tax from federal associations and tended at the same time to force federal associations to follow state rather than federal regulations. It is difficult to conceive of a nondiscriminatory reason for the 50-mile limit on deductions. For these reasons, the Court of Appeals for the First Circuit held the tax discriminatory under § 5 (h). 481 F. 2d, at 970.

[4] Cf. n. 3, *supra.* The sparse evidence introduced on this point by the associations is ambiguous at best. For example, in three of the seven years from 1968 to 1975, federal associations put a larger proportion of their assets into required reserves than did state savings banks, which are the dominant state mutual institutions. From 1970 through 1973, federal associations made smaller contributions to surplus than state savings banks, but in these years the federal associations may have been simply consuming reserves built up under the stringent requirements of their pre-1970 charters.

is foreclosed by the fact that the tax was enacted when federal reserve requirements were as high as state requirements.

## II

Massachusetts does not impose its tax on credit unions. Arguing that credit unions in Massachusetts are "similar" to federal savings and loan associations, the associations claim entitlement to the credit unions' exemption.

There are indeed similarities between these two kinds of financial institutions. For example, both are characterized by mutual ownership and control; 12 CFR § 544.1 (1977); Mass. Gen. Laws Ann., ch. 171, §§ 10, 13, and 24 (West 1971 and Supp. 1977); and both are empowered to make loans secured by real estate. 12 U. S. C. § 1464 (c) (1976 ed.); Mass. Gen. Laws Ann., ch. 171, § 24 (West Supp. 1977). But the institutions are far from identical.

Congress has long treated federally chartered credit unions differently from federally chartered savings and loan associations, giving the credit unions, but not the savings and loan associations, an exemption from state taxes. See 12 U. S. C. § 1768 (1976 ed.). In establishing insurance programs to protect members' deposits, Congress distinguished state and federal credit unions from state and federal savings and loan associations. See 12 U. S. C. §§ 1726 (a) and 1781 (a) (1976 ed.). Moreover, courts in other jurisdictions have generally rejected the claim that credit unions are "similar" under § 5 (h) to federal savings and loan associations.[5]

The distinctions found in those jurisdictions have validity in Massachusetts as well. By law, Massachusetts credit unions must give preference to small personal loans, Mass. Gen. Laws

---

[5] See *Manchester Federal Savings & Loan Assn.* v. *State Tax Comm'n*, 105 N. H. 17, 191 A. 2d 529 (1963); *First Federal Savings & Loan Assn.* v. *Connelly*, 142 Conn. 483, 115 A. 2d 455 (1955), appeal dismissed, 350 U. S. 927; *State* v. *Minnesota Federal Savings & Loan Assn.*, 218 Minn. 229, 15 N. W. 2d 568 (1944).

Ann., ch. 171, § 24 (West Supp. 1977), while the primary lending role of federal savings and loan associations is "to provide for the financing of homes." 12 U. S. C. § 1464 (a) (1976 ed.). Massachusetts credit unions may lend only to members, Mass. Gen. Laws Ann., ch. 171, § 24 (West Supp. 1977), while federal associations are not so limited. And, despite individual exceptions, there are major differences between the actual lending practices of state credit unions as a class and federal associations as a class.[6]

Of greater importance than these differences, however, is the fact that Massachusetts credit unions are not the federal associations' closest state-chartered competitors. Massachusetts savings banks and cooperative banks have much more in common with federal associations than do state credit unions; their business is unquestionably similar to that of the federal associations.[7] These institutions are an important segment of Massachusetts' financial community.[8] Any favoritism shown

---

[6] As the Supreme Judicial Court noted:

"In 1972, . . . credit unions placed 30.1% of their total investments (in dollars) in real estate mortgages. Federal savings and loan associations had 87.7% of their total investments (in dollars) in real estate mortgages. . . . Federal savings and loan associations had almost 98% of their total loans in real estate mortgages . . . . Credit unions, on the other hand, had only about 42% of their total loans in real estate mortgages." 372 Mass. 478, 493–494, 363 N. E. 2d 474, 484 (1977).

[7] See, e. g., Commissioner of Corporations & Taxation v. Flaherty, 306 Mass. 461, 28 N. E. 2d 433 (1940); Springfield Institution for Savings v. Worcester Federal Savings & Loan Assn., 329 Mass. 184, 107 N. E. 2d 315 (1952). Massachusetts cooperative banks had more than 97% of their total loans in real estate mortgages in 1972, while state savings banks had 95% of their loans in real estate mortgages. Federal associations had almost 98% of their loans in real estate mortgages. Cooperative banks had 80.4% of their total dollar investments in real estate mortgages, and savings banks had 65.3% in such mortgages. The figure for federal associations was 87.7%. See 372 Mass., at 493, 363 N. E. 2d, at 484.

[8] Their assets greatly exceed those of state credit unions. State savings banks had assets of almost $18.5 billion in 1973; cooperative banks had almost $3 billion in assets; federal associations had almost $2.5 billion; and

to Massachusetts credit unions falls as harshly on them as on the federal associations. Nonetheless, the Massachusetts Legislature has concluded that credit unions are not similar to state cooperative and savings banks or to state and federal savings and loan associations.

When Congress required that federal savings and loan associations be placed in the same classification as "similar" state institutions, it certainly did not assume that every local and mutual or cooperative thrift and home-financing institution is similar to a federal association. See 12 U. S. C. § 1464 (h) (1964 ed.). It recognized that States might classify their own institutions in various ways. Massachusetts has excluded credit unions from a large classification that includes the institutions most closely resembling federal savings and loan associations. The composition of the class in which Massachusetts has placed the federal associations satisfies the federal statute's central purpose of protecting federal associations from discriminatory treatment. We conclude that Massachusetts has not imposed a greater tax on the federal associations than that imposed on other "similar" institutions.[9]

---

credit unions had over $1 billion. App. 131–132; Annual Report of the Commissioner of Banks, Commonwealth of Massachusetts, Division of Banks and Loan Agencies, Sec. B (Credit Unions), iv (1973).

[9] Only two of the associations' remaining attacks on the statute deserve mention. They claim that Massachusetts' tax is not one of the enumerated taxes approved by § 5 (h), which allows a nondiscriminatory "tax on [federal] associations or their franchise, capital, reserves, surplus, loans, or income." 12 U. S. C. § 1464 (h) (1976 ed.). Whether or not this tax may be characterized as a "franchise" or an "income" tax, it is certainly a tax "on" federal associations and therefore within the ambit of § 5 (h).

The federal associations also argue that the state statute violates the Commerce Clause by creating a risk of multiple taxation. They claim that some neighboring State may at some time in the future attempt to tax the income from loans secured by property in that State. This argument is wholly speculative and unsupported by evidence in the record.

Accordingly, the judgment of the Supreme Judicial Court is affirmed.

*So ordered.*

Mr. Justice Blackmun, concurring in part and dissenting in part.

Section 5 (h) of the Home Owners' Loan Act of 1933, as amended, 76 Stat. 984, 12 U. S. C. § 1464 (h) (1976 ed.), reads:

> "No State, county, municipal, or local taxing authority shall impose any tax on such associations or their franchise, capital, reserves, surplus, loans, or income greater than that imposed by such authority on other similar local mutual or cooperative thrift and home financing institutions."

The Court, in speaking of this statute, has said: "This provision unequivocally bars discriminatory state taxation of the Federal Savings and Loan Associations." *Laurens Federal Savings & Loan Assn.* v. *South Carolina Tax Comm'n,* 365 U. S. 517, 523 (1961).

I agree with the Court's ruling today on the first issue, namely, that the lesser reserve deduction available for federal savings and loan associations of itself does not demonstrate that the associations pay a greater tax than similar Massachusetts savings banks.

On the second issue, however, I am in disagreement with the Court and, to that extent, dissent from its opinion. For this issue, the important focus of the statute is on the word "similar," and the measure of the Commonwealth's allowable tax is only that imposed "on other similar local mutual or cooperative thrift and home financing institutions."

There is no argument here that Massachusetts credit unions are not "local mutual or cooperative thrift and home financing institutions," within the meaning of § 5 (h). See Mass. Gen. Laws Ann., ch. 171, § 2 (West 1971). The Supreme Judicial

Court so found, 372 Mass. 478, 492, 363 N. E. 2d 474, 483 (1977), and no challenge to that finding is made here. The question, then, is whether Massachusetts credit unions are "similar" to federal savings and loan associations. If they are similar, the tax Massachusetts would impose on the federal entities, see Mass. Gen. Laws Ann., ch. 63, § 11 (West Supp. 1977), violates the statute, for the Commonwealth's excise does not apply at all to Massachusetts credit unions.

The Court, in construing a similar federal statute, Rev. Stat. § 5219, as amended, 12 U. S. C. § 548 (1)(b), which had barred state taxation of the shares of national banks "at a greater rate than is assessed upon other moneyed capital . . . coming into competition with the business of national banks," and at a rate higher than the highest rates assessed upon business corporations, observed that Congress intended "to prohibit only those systems of state taxation which discriminate in practical operation against national banking associations or their shareholders as a class." *Tradesmens Nat. Bank* v. *Oklahoma Tax Comm'n,* 309 U. S. 560, 567 (1940); *Michigan Nat. Bank* v. *Michigan,* 365 U. S. 467, 473 (1961). The policy of § 5 (h) obviously is to assure that the States do not put federal associations to any competitive disadvantage with respect to local savings institutions.

The statutory term "similar" usually, and certainly here, does not mean "identical." [1] The Massachusetts credit union and the federal savings and loan association are "similar" with respect to their fundamental elements. Each has mutuality of ownership and control. Each has the pronounced ability to attract savings. Each is empowered to make first mortgage residential real estate loans on substantially the same terms

---

[1] See *Commonwealth* v. *Fontain,* 127 Mass. 452, 454 (1879); *Chicago* v. *Vaccarro,* 408 Ill. 587, 601, 97 N. E. 2d 766, 773 (1951); *Thomas* v. *Consumers Power Co.,* 58 Mich. App. 486, 493–494, 228 N. W. 2d 786, 790 (1975); *Miller* v. *Allstate Ins. Co.,* 66 Wash. 2d 871, 875, 405 P. 2d 712, 714 (1965).

and to approximately the same extent. The Massachusetts credit union has the statutory authority to make loans secured by first mortgages on real estate for terms up to 30 years, for 90% of the value of the property, and to a maximum amount of $40,000. See Mass. Gen. Laws Ann., ch. 171, §§ 24 (B)(*a*) (4) and (*b*)(8) (West Supp. 1977), and 1977 Mass. Acts, ch. 20. A federal association may make real estate loans for terms up to 30 years, for 80% of the value of the property, and to a maximum amount of $55,000. See 12 U. S. C. § 1464 (c) (1976 ed.); 12 CFR § 545.6–1 (a)(1)(i) (1977).

Although the Massachusetts credit union, to be sure, may make loans only to members and is required to give "preference" to "personal loans," see Mass. Gen. Laws Ann., ch. 171, § 24 (West Supp. 1977), this distinction is minor and does not demonstrate that the credit union is not "similar" to the federal association, within the meaning of § 5 (h). There is no statutory limitation on the membership of the Massachusetts credit union, other than self-imposed conditions of residence, occupation, or association, see Mass. Gen. Laws Ann., ch. 171, § 7 (*c*) (West 1971), and a small deposit will qualify a prospective borrower as a member. In addition, there is no statutory enforcement of the "preference" in favor of personal loans. The Supreme Judicial Court observed, 372 Mass., at 493–494, 363 N. E. 2d, at 484, that in 1972 Massachusetts credit unions placed 30.1% of their total dollar investments in real estate mortgages, and 42% of their total loans in real estate mortgages.[2] As of the end of 1973, they had $329 million as outstanding mortgage loans. Large Massachusetts credit unions may invest up to 80% of their assets in real estate loans, see Mass. Gen. Laws Ann., ch. 171, § 24 (B)(*b*) (7) (West Supp. 1977).

All this leads me to conclude that the Massachusetts credit union in all pertinent respects is "similar," and not dissimilar,

---

[2] Federal associations had 87.7% of their total dollar investments in real estate mortgages and almost 98% of their total loans in such mortgages.

to the federal savings and loan association.[3]  Both perform the same functions in that they attract savings upon which they pay interest, and they make loans, substantial amounts of which are first mortgage residential loans.  It follows, in my view, that, because of these similarities, the exemption of Massachusetts credit unions from the Massachusetts excise tax to which federal savings and loan associations are subject renders the tax invalid, under § 5 (h), as applied to the federal institutions.

I therefore would reverse the judgment of the Supreme Judicial Court of Massachusetts.

---

[3] See Message of the President to the Congress on Tax Reduction and Reform, Jan. 20, 1978, 14 Weekly Comp. of Pres. Docs. 158, 172.