[No. A095666. First Dist., Div. Three. Jan. 23, 2003.]

MYRTLE A. LOPEZ, Plaintiff and Appellant, v.
WORLD SAVINGS AND LOAN ASSOCIATION, Defendant and
Respondent.

## COUNSEL

Alborg, Veiluva & Cannata, Thomas E. Alborg, Michael John Veiluva and James C. Jardin for Plaintiff and Appellant.

Bill Lockyer, Attorney General, Richard M. Frank, Chief Assistant Attorney General, Herschel T. Elkins, Assistant Attorney General, Ronald A. Reiter and Michele R. Van Gelderen, Deputy Attorneys General, as Amici Curiae on behalf of Plaintiff and Appellant.

Musick, Peeler & Garrett, Barry D. Hovis and Walter J. R. Traver for Defendant and Respondent.

Carolyn J. Buck, Thomas J. Segal and Paul K. Hutson for The Office of Thrift Supervision as Amicus Curiae on behalf of Defendant and Respondent.

## OPINION

**POLLAK, J.**—Class action plaintiff challenges the practice of a federal savings and loan association of charging a fee of $10 for the transmission of a payoff demand statement by fax, over and above the fee authorized by Civil Code section 2943, subdivision (e)(6) for furnishing such a statement. Plaintiff's causes of action for violating this section and for engaging in an unfair, deceptive and unlawful business practice in violation of Business and Professions Code section 17200 were dismissed on the ground that the claims are preempted by federal law. Thereafter, summary judgment was granted on the remaining causes of action for breach of contract, fraud and unjust enrichment on the ground that these claims are not viable under state law. We agree that federal law has preempted the claims under section 2943 of the Civil Code and section 17200 of the Business and Professions Code and that the other causes of action were properly rejected. We therefore affirm.

### Factual and Procedural Background

Plaintiff and appellant Myrtle A. Lopez and her deceased husband Michael obtained a real estate loan in 1993 from defendant and respondent World Savings and Loan Association (World), a federally chartered savings and loan association. The loan was secured by a deed of trust which, in conformity with Civil Code section 2943, subdivision (e)(6) as it then read,[1] provided that World "may collect a fee of $60.00 . . . for furnishing any statement of obligation with respect to" the secured transaction. In November 1996, Lopez sought to pay off the loan as part of a refinancing. An escrow was opened at Chicago Title Company (Chicago Title) and the escrow officer requested a payoff demand from World and asked that it be returned "via fax" in order to avoid delays and ensure the expeditious close of escrow. World did fax to Chicago Title a payoff demand, which included a $60 fee for the demand and a separately itemized fax fee of $10, which Mr. and Mrs. Lopez signed, indicating their acceptance. The escrow was not in position to close prior to the expiration of the original payoff demand, so an updated statement was requested and provided by fax. The updated demand included an additional $10 fax fee and another $60 fee for the second demand statement, but World did not require payment of the second $60

---

[1] In 2001, the statute was amended to reduce the authorized charge from $60 to $30. (Stats. 2001, ch. 560, § 2.)

fee.[2] The loan, including $20 in fax fees, was paid through the escrow on November 26, 1996.

In September 1999, Lopez filed a putative class action complaint against World, alleging that the fax fees were prohibited by the terms of the deed of trust and by Civil Code section 2943, subdivision (e)(6). The first cause of action was based upon California's unfair competition law (UCL), Business and Professions Code section 17200, the second on breach of contract, the third on fraud, the fourth on unjust enrichment, and the fifth on Civil Code section 2943. World answered and moved for judgment on the pleadings as to all causes of action on the ground that the Home Owners Loan Act (HOLA), 12 United States Code section 1461 et seq., and the regulations issued thereunder by the Office of Thrift Supervision (OTS), 12 Code of Federal Regulations (12 C.F.R.) part 560.2 (2002), preempted state law with respect to the propriety of these charges. The trial court granted the motion without leave to amend as to the first and fifth causes of action, holding that "12 CFR sec. 560.2 explicitly preempts the field of '. . . loan-related fees, including without limitation, initial charges, prepayment penalties, servicing fees, and overlimit fees . . . .' There does not seem to be a valid basis for distinguishing these fees from other fees imposed by lenders. Allowing state regulation of these fees would interfere with the federal goal of a 'uniform Federal scheme of regulation.' " The court denied the motion with respect to the other three causes of action on the ground that they were "not based totally upon Civil Code section 2943 and Business and Professions Code section 17200."

Thereafter, on Lopez's motion, the court conditionally certified a class "consisting of all persons who were borrowers of [World] and were charged an additional fee for the fax transmission of a payoff demand statement."[3] Before notice had been given to class members, World moved for summary adjudication of the remaining causes of action, and the motion was granted based upon an analysis that will be discussed more fully below. Judgment was entered in favor of World, and this timely appeal followed.

*Discussion*

## 1. *Preemption*

Lopez's fifth cause of action alleged that World breached Civil Code section 2943, subdivision (e)(6) by charging a fax fee in addition to the fee

---

[2]Although of no significance to the disposition of the issues presented by this appeal, there is an unmistakable irony to the fact that World voluntarily relinquished the second $60 demand statement fee, which it apparently was entitled to collect, but has been challenged for collecting two $10 fees for the transmission of the two statements by fax.

[3]The condition was "that there remain in the action issues of law or fact that are common to all class members and that such issues are deemed by the Court to be substantial."

authorized by that section for furnishing the demand statement. Subdivision (c) of section 2943 provides that "[a] beneficiary . . . shall, on the written demand of an entitled person,[4] . . . prepare and deliver a payoff demand statement to the person demanding it within 21 days of the receipt of the demand." Subdivision (e)(6) of section 2943, as it read prior to an amendment in 2001, provided that "[t]he beneficiary may make a charge not to exceed sixty dollars ($60) for furnishing each required statement."[5] The first cause of action alleged that by charging a $10 fax fee, in addition to the $60 fee for the statement, World violated both Civil Code section 2943 and the terms of the deed of trust, and thereby engaged in an unfair, deceptive and unlawful business practice in violation of the UCL.

Without questioning whether section 2943 of the Civil Code should properly be read to prohibit the fax fee—an issue that has not been addressed by the parties—World's attack on the sufficiency of the first and fifth causes of action argues that section 2943 is preempted by federal law. World is a federally chartered savings and loan association. Congress enacted HOLA to promote safe and sound lending practices among such associations. "The paramount purpose of HOLA is to ensure the solvency of federal associations" through a uniform scheme of regulation so that the public has access to means of home financing. (*People ex rel. Sepulveda v. Highland Fed. Savings & Loan* (1993) 14 Cal.App.4th 1692, 1712 [19 Cal.Rptr.2d 555] (*Highland*); see *Fidelity Federal Sav. & Loan Assn. v. De La Cuesta* (1982) 458 U.S. 141, 159-160 [102 S.Ct. 3014, 3025-3026, 73 L.Ed.2d 664] (*Fidelity*).) HOLA created a system of federal savings and loan associations originally regulated by the Federal Home Loan Bank Board (FHLBB). Subsequently, Congress enacted the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, 12 United States Code section 1462 et seq., which replaced the FHLBB with OTS. Until 1996, the applicable regulations were located in part 545 of title 12 of the C.F.R. (2002). Part 545.2 expressed the extent of preemption of state law affecting the operations of federal savings associations as follows: "The regulations in this Part 545 are promulgated pursuant to the plenary and exclusive authority of the Office to regulate all aspects of the operations of Federal savings associations, as set forth in section 5(a) of [HOLA]. *This exercise of the [OTS's] authority* is preemptive of any state law purporting to address the subject of the operations of a Federal savings association." (Italics added.) In 1996, OTS moved the lending regulations to part 560 of 12 C.F.R. and replaced

---

[4]An "entitled person" is defined to include the trustor or mortgagor, or the successor in interest in the mortgaged or trust property, any beneficiary under a deed of trust, any person having a subordinate lien or encumbrance of record, and an escrow holder. (Civ. Code, § 2943, subd. (a)(4).)

[5]See footnote 1, *ante.*

part 545.2 with part 560.2 (2002). The new provision provides that "(a) . . . OTS hereby occupies the entire field of lending regulation for federal savings associations. OTS intends to give federal savings associations maximum flexibility to exercise their lending powers in accordance with a uniform federal scheme of regulation. Accordingly, federal savings associations may extend credit as authorized under federal law . . . without regard to state laws purporting to regulate or otherwise affect their credit activities, except to the extent provided in paragraph (c) of this section."[6] Paragraph (b)

---

[6]Part 560.2 of 12 C.F.R. (2002) reads in full as follows: "(a) *Occupation of field.* Pursuant to sections 4(a) and 5(a) of the HOLA, 12 U.S.C. 1463(a), 1464(a), OTS is authorized to promulgate regulations that preempt state laws affecting the operations of federal savings associations when deemed appropriate to facilitate the safe and sound operation of federal savings associations, to enable federal savings associations to conduct their operations in accordance with the best practices of thrift institutions in the United States, or to further other purposes of the HOLA. To enhance safety and soundness and to enable federal savings associations to conduct their operations in accordance with best practices (by efficiently delivering low-cost credit to the public free from undue regulatory duplication and burden), OTS hereby occupies the entire field of lending regulation for federal savings associations. OTS intends to give federal savings associations maximum flexibility to exercise their lending powers in accordance with a uniform federal scheme of regulation. Accordingly, federal savings associations may extend credit as authorized under federal law, including this part, without regard to state laws purporting to regulate or otherwise affect their credit activities, except to the extent provided in paragraph (c) of this section or § 560.110 of this part. For purposes of this section, 'state law' includes any state statute, regulation, ruling, order or judicial decision. [¶] (b) *Illustrative examples.* Except as provided in § 560.110 of this part, the types of state laws preempted by paragraph (a) of this section include, without limitation, state laws purporting to impose requirements regarding: [¶] (1) Licensing, registration, filings, or reports by creditors; [¶] (2) The ability of a creditor to require or obtain private mortgage insurance, insurance for other collateral, or other credit enhancements; [¶] (3) Loan-to-value ratios; [¶] (4) The terms of credit, including amortization of loans and the deferral and capitalization of interest and adjustments to the interest rate, balance, payments due, or term to maturity of the loan, including the circumstances under which a loan may be called due and payable upon the passage of time or a specified event external to the loan; [¶] (5) Loan-related fees, including without limitation, initial charges, late charges, prepayment penalties, servicing fees, and overlimit fees; [¶] (6) Escrow accounts, impound accounts, and similar accounts; [¶] (7) Security property, including leaseholds; [¶] (8) Access to and use of credit reports; [¶] (9) Disclosure and advertising, including laws requiring specific statements, information, or other content to be included in credit application forms, credit solicitations, billing statements, credit contracts, or other credit- related documents and laws requiring creditors to supply copies of credit reports to borrowers or applicants; [¶] (10) Processing, origination, servicing, sale or purchase of, or investment or participation in, mortgages; [¶] (11) Disbursements and repayments; [¶] (12) Usury and interest rate ceilings to the extent provided in 12 U.S.C. 1735f-7a and part 590 of this chapter and 12 U.S.C. 1463(g) and § 560.110 of this part; and [¶] (13) Due-on-sale clauses to the extent provided in 12 U.S.C. 1701j-3 and part 591 of this chapter. [¶] (c) *State laws that are not preempted.* State laws of the following types are not preempted to the extent that they only incidentally affect the lending operations of Federal savings associations or are otherwise consistent with the purposes of paragraph (a) of this section: [¶] (1) Contract and commercial law; [¶] (2) Real property law; [¶] (3) Homestead laws specified in 12 U.S.C. 1462a(f); [¶] (4) Tort law; [¶] (5) Criminal law; and [¶] (6) Any other law that OTS, upon review, finds: [¶] (i) Furthers a vital state interest; and [¶] (ii) Either

lists examples of the types of state laws preempted, including "(5) Loan-related fees, including without limitation, initial charges, late charges, pre-payment penalties, servicing fees, and overlimit fees." Paragraph (c) provides that "State laws of the following types are not preempted to the extent that they only incidentally affect the lending operations of Federal savings associations or are otherwise consistent with the purposes of paragraph (a) . . . : [¶] (1) Contract and commercial law; [¶] (2) Real property law; [¶] . . . [and] [¶] (6) Any other law that OTS, upon review, finds: [¶] (i) Furthers a vital state interest; and [¶] (ii) Either has only an incidental effect on lending operations or is not otherwise contrary to the purposes expressed in paragraph (a)."

█ Under the supremacy clause, federal law of course may preempt the operation of state law. "[T]he laws of the United States . . . shall be the supreme law of the land; and the judges in every state shall be bound thereby, any thing in the Constitution or laws of any state to the contrary notwithstanding." (U.S. Const., art. VI, cl. 2.) Whether state law is preempted by federal law depends on whether Congress intended that federal law supersede state law. (*Louisiana Public Service Comm'n v. FCC* (1986) 476 U.S. 355, 369 [106 S.Ct. 1890, 1898-1899, 90 L.Ed.2d 369]; *Fidelity, supra,* 458 U.S. at p. 152 [102 S.Ct. at p. 3022].) There are three recognized ways in which congressional intent to supercede state law may be established. First, Congress may expressly preempt state law by defining explicitly the extent to which an enactment is preemptive. (*Cipollone v. Liggett Group, Inc.* (1992) 505 U.S. 504, 516 [112 S.Ct. 2608, 2617, 120 L.Ed.2d 407]; *Highland, supra,* 14 Cal.App.4th at p. 1708.) Second, Congress may impliedly preempt state law by establishing a " 'scheme of federal regulation . . . so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it.' " (*Fidelity, supra,* 458 U.S. at p. 153 [102 S.Ct. at p. 3022].) Third, "[e]ven where Congress has not completely displaced state regulation in a specific area, state law is nullified to the extent that it actually conflicts with federal law." (*Ibid.*)

While these three tests are expressed in terms of congressional intent, "[f]ederal regulations have no less pre-emptive effect than federal statutes." (*Fidelity, supra,* 458 U.S. at p. 153 [102 S.Ct. at p. 3022]; *Black v. Financial Freedom Senior Funding Corp.* (2001) 92 Cal.App.4th 917, 926 [112 Cal.Rptr.2d 445].) "For purposes of determining Congressional intent, federal regulations enacted under authority granted by Congress are entitled to the same preemptive effect as a federal statute." (*Wisconsin League of Financial Inst. v. Galecki* (W.D.Wis. 1989) 707 F.Supp. 401, 404 (*Galecki*).)

---

has only an incidental effect on lending operations or is not otherwise contrary to the purposes expressed in paragraph (a) of this section."

If the source of the federal law which is claimed to preempt state law is a federal regulation, the additional question that must be answered is whether the particular regulation is one that Congress authorized the promulgating agency to adopt. Is the regulation "within the scope of the [agency's] delegated authority?" (*Fidelity, supra,* 458 U.S. at p. 154 [102 S.Ct. at p. 3023]; *New York v. F.E.R.C.* (2002) 535 U.S. 1 [122 S.Ct. 1012, 1023, 152 L.Ed.2d 47]; *Gibson v. World Savings & Loan Assn.* (2002) 103 Cal.App.4th 1291, 1297 [128 Cal.Rptr.2d 19].)

World contends and the trial court held that Civil Code section 2943 has been expressly preempted by OTS's regulation, 12 C.F.R. part 560.2 (2002). Two questions are thus presented: Is 12 C.F.R. part 560.2 intended to preempt a state law regulating the fees that a federal savings and loan association may charge for providing a payoff demand statement and, if so, is such a regulation within the scope of OTS's delegated authority?

A. *12 C.F.R. Part 560.2 Is Intended to Preempt the Entire Field of Lending Regulations for Federal Savings Associations, Which Includes Regulation of Payoff Demand Statement Fees.*

Although the parties direct much of their argument to an OTS opinion letter interpreting 12 C.F.R. part 560.2 (2002),[7] and to the weight that should be accorded the letter,[8] we believe the text of the regulation makes its meaning perfectly clear. (See *Christensen v. Harris County, supra,* 529 U.S. at p. 588 [120 S.Ct. at p. 1663]; *Wards Cove Packing Corp. v. National Marine Fisheries Service* (9th Cir. 2002) 307 F.3d 1214, 1219 ["the plain meaning of a regulation governs and deference to an agency's interpretation of its regulation is warranted only when the regulation's language is ambiguous"].) As one court observed with respect to even the predecessor regulation, 12 C.F.R. part 545.2 (2002), "There is nothing ambiguous about the intent of the Federal Home Loan Bank Board to preempt state laws governing the operations of federal savings institutions." (*Galecki, supra,* 707 F.Supp. at p. 404.) The current regulation, 12 C.F.R. part 560.2, states even more explicitly that "OTS hereby occupies the entire field of lending regulation for federal savings associations." The regulation goes on to state that OTS intends to give the associations "maximum flexibility to exercise

---

[7]A 1999 opinion letter from the OTC opined that "[t]he fees at issue in the example provided by the Associations, demand statement fees and facsimile charges, are loan-related fees. . . . Accordingly, to the extent that the [UCL] is being used to regulate the imposition of loan-related fees that are part of the Associations' lending programs, the [UCL] is preempted." (OTS opn. letter, Mar. 10, 1999, p. 7.)

[8]Compare *Christensen v. Harris County* (2000) 529 U.S. 576, 586-588 [120 S.Ct. 1655, 1662-1663, 146 L.Ed.2d 621] with *Skidmore v. Swift & Co.* (1944) 323 U.S. 134, 140 [65 S.Ct. 161, 164, 89 L.Ed. 124].

their lending powers in accordance with a uniform federal scheme of regulation" and that except as provided in paragraph (c) of the regulation, federal savings associations may extend credit as authorized by federal law "without regard to state laws purporting to regulate or otherwise affect their credit activities." (*Ibid.*) Thus, the federal regulation is intended to preempt all state laws purporting to regulate any aspect of the lending operations of a federally chartered savings association, whether or not OTS has adopted a regulation governing the precise subject of the state provision. If there is no federal restriction imposed on a particular practice, the associations have been given "maximum flexibility" to operate as they see fit, so long as they conform with more general norms of honesty and compliance with contractual obligations.

Lopez and the Attorney General as amicus curiae argue that the federal regulation should not be read to preempt state law with respect to a practice as to which OTS has not issued its own regulation and over which there is no other federal control—such as imposing charges for providing payoff demand statements. However, as the court stated in *Galecki*, "The regulations contemplate that full authority and flexibility is granted unless expressly limited. Under the interpretation advanced by [Lopez and the Attorney General] the [OTS] would be required to affirmatively express by regulation every power held by a federal institution or risk restrictions by the states. Such an interpretation is based upon neither reason nor common sense. [¶] The explicit preemption language, in the context of regulations which presume that the absence of a provision limiting authority means that an association may exercise full authority, is clearly intended to cover those areas where no limitation is imposed." (*Galecki, supra,* 707 F.Supp. at p. 405.) This view recently was endorsed in a very thorough opinion from the Second Appellate District in *Washington Mutual Bank v. Superior Court* (2002) 95 Cal.App.4th 606 [115 Cal.Rptr.2d 765] (*Washington Mutual*). The court held there that 12 C.F.R. part 560.2 (2002) preempts causes of action against a federally chartered association based on the violation of Civil Code section 2948.5, restricting the right to charge preclosing interest on home loans, despite the absence of OTS regulations on the subject of preclosing interest. The court held that "preemption of state law claims premised on the theory that the charging of preclosing interest by a federal savings and loan association is unlawful is explicit by virtue of the provisions of 12 [C.F.R. part 560.2 (2001)] which expressly preempts any state law governing the lending operations of a federal savings institution." (95 Cal.App.4th at p. 621.)

The Attorney General contends that 12 C.F.R. part 560.2 (2002) is not a lending regulation. He argues that a fee for providing a payoff demand

statement is not a loan-related fee, within the meaning of paragraph (b)(5) of the regulation, but rather is an integral part of California's general real property law, excluded from the scope of preemption by paragraph (c). The Attorney General argues that all of the loan-related fees enumerated in paragraph (b)(5)—initial charges, late charges, prepayment penalties, servicing fees, and overlimit fees—"directly concern the loan transaction and relate to the borrower's payment of the loan," while section 2943 requires the lender to provide a payoff demand statement to a variety of interested persons other than the borrower. Moreover, the argument continues, payoff demand statements are utilized in connection with the sale of property, refinancings, and the foreclosure process, so that the fee for these statements "falls within California's general real property law with only an incidental effect, if any, . . . on the federal lender's lending operations." However, whether charged to the borrower or to another person requesting the statement, the fee for providing a payoff demand statement is a "servicing fee." Providing the payoff demand statement is a service provided by the association as lender in connection with its outstanding loan, and is a necessary step in paying off the loan. While real estate loans obviously play a significant role in many real property transactions, the regulation of the amount a lender may charge for providing a service relating to the issuance or payoff of a loan is within the "field of lending regulation" as distinguished from real property law.

Lopez and the Attorney General argue that finding OTS intended to preempt provisions such as Civil Code section 2943 would disregard three controlling California precedents. The first of these decisions is *Siegel v. American Savings & Loan Assn.* (1989) 210 Cal.App.3d 953 [258 Cal.Rptr. 746] (*Siegel*), which held that Civil Code section 2941—regulating the imposition of reconveyance fees—and several common law claims predicated on the validity of section 2941, were not preempted by 12 C.F.R. part 545.2 (2002). As with fees for payoff demand statements, the federal agency had adopted no regulations concerning the charges a federal savings and loan association could impose for the execution of a reconveyance. The court held that 12 C.F.R. part 545.2 was not intended to preempt Civil Code section 2941 because the regulation explicitly provided that the "exercise" of the federal agency's authority was preemptive of state law on the subject, and that since the agency had not in fact exercised its authority to regulate reconveyance fees, the agency had not intended to preempt state law that did. (*Siegel, supra,* at pp. 959-961.) The *Siegel* court observed that the agency "is capable of saying it means to expressly preempt all state law in an area," contrasting 12 C.F.R. part 545.2 with the preamble to the regulation that *Fidelity, supra,* 458 U.S. 141 held to preempt state law concerning due-on-sale clauses (" ' "[f]ederal associations shall not be bound by or

subject to any conflicting State law which imposes different . . . due-on-sale requirements" ' "). (*Siegel, supra,* 210 Cal.App.3d at pp. 960-961.) The court concluded: 12 C.F.R. part 545.2 "contains no such statement that federal law is preemptive of all state common law claims. Indeed, the fact that such preemption language appears in the due-on-sale regulation suggests that the Board does not believe it has passed a regulation preempting all state laws, which affect federally chartered associations. We find no express preemption of plaintiffs' claims." (*Siegel, supra,* at p. 961.)

Subsequent to the decision in *Siegel,* however, OTS replaced 12 C.F.R. part 545.2 with part 560.2 (2002). Lopez and the Attorney General place great weight on OTS's statement at the time of the change that part 560.2 was intended "to confirm and carry forward its existing preemption position" as expressed in part 545.2, and that the new provision was restating "longstanding preemption principles applicable to federal savings associations, as reflected in earlier regulations, court cases, and numerous legal opinions issued by OTS" and its predecessor agency. (61 Fed.Reg. 50951, 50965 (Sept. 30, 1996).) Lopez and the Attorney General read this language as adopting the decision in *Siegel* as to the intended scope of preemption, while World argues that the reference was to federal decisions holding that part 545.2 was intended to displace state laws regarding lending (e.g., *Conference of Federal Sav. & Loan Ass'ns v. Stein* (9th Cir. 1979) 604 F.2d 1256, 1260 ["In our judgment the regulatory control of the Bank Board over federal savings and loan associations is so pervasive as to leave no room for state regulatory control"]) and to prior agency opinion letters which had expressed the same broad view. The balance of OTS's explanatory statement when adopting section 560.2 removed any ambiguity: "OTS has consistently taken the position that, with certain narrow exceptions, any state laws that purport to affect the lending operations of federal savings associations are preempted. None of the changes implemented today should be construed as evidencing in any way an intent by OTS to change this long held position: OTS still intends to occupy the field of lending regulation for federal savings associations." (61 Fed.Reg. 50951, 50952 (Sept. 30, 1996).) And, indeed, as set forth above, the language of the new regulation does express its preemptive reach far more explicitly than the provision it replaced. As if responsive to the discussion in *Siegel,* part 560.2 removed the reference to the "exercise" of OTS's authority, and said, instead, that "OTS hereby occupies the entire field of lending regulation for federal savings associations." We agree with the Attorney General's observation that reading 12 C.F.R. part 560.2 as we do casts serious doubt on the continuing validity of the holding in *Siegel.* However, this results not from any disagreement on our part with the manner in which the *Siegel* court construed 12 C.F.R. part 545.2, but from the manner in which OTS clarified its intent when replacing part 545.2 with part 560.2.

The other two decisions relied on by Lopez and the Attorney General, which found no preemption under the previous federal regulation, are not inconsistent with our conclusion, and their continuing validity is in no way brought into question by our decision here. In *Highland, supra,* 14 Cal.App.4th 1692, the court found no preemption of state law claims against a federal savings association for engaging in transactions with straw men in order to frustrate enforcement of the state's habitability law. The court "found no provision in HOLA nor any particular regulation . . . which expressly preempt[s] the statutory action by the People for unfair business practices and the causes of action by the tenant plaintiffs for fraud, RICO violations, etc." (*Id.* at p. 1708.) In rejecting the claim of implied preemption, the court stated: "From our review of HOLA and its concomitant regulations we have found no statutory provision or regulation which even purports to address the subject of minimum housing standards. Also, any impact or intrusion on the 'operations' of Highland is minimal and indirect." (*Id.* at p. 1712.)

Finally, in *Fenning v. Glenfed, Inc.* (1995) 40 Cal.App.4th 1285 [47 Cal.Rptr.2d 715] (*Fenning*), the court held that federal law did not preempt claims against Glendale Federal Bank for unfair and deceptive advertising and sales practices in violation of the UCL, and for fraud. These claims were based on the allegation that the bank participated in a scheme to deceive customers as to the relationship between the bank, whose investment products were federally insured, and Glenfed Brokerage, which sold uninsured and highly risky investments. The court found "no reason to suppose that Congress intended to preempt common law tort claims, effectively granting savings associations immunity from such state law claims" and held that "the Bank's argument that, by permitting fraud and unfair trade practices suits, the state is regulating the Bank's conduct, is off the mark. Plaintiff's ability to sue the Bank for fraud does not interfere with what the Bank may do, that is, how it may conduct its operations; it simply insists that the Bank cannot misrepresent how it operates, or employ fraudulent methods in its operations. Put another way, the state cannot dictate to the Bank how it can or cannot operate, but it can insist that, however the Bank chooses to operate, it do so free from fraud and other deceptive business practices." (*Fenning*, 40 Cal.App.4th at pp. 1298-1299, fn. omitted.)

The contrast between *Highland* and *Fenning,* on one hand, and this case on the other, bears emphasis. In their briefs, the parties sometimes characterize the issue presented here as whether 12 C.F.R. part 560.2 (2002) preempts the UCL. This states the issue far too broadly. ■ As reflected by the decisions in *Highland* and *Fenning,* the UCL remains available to remedy a myriad of potential unfair, unlawful, and fraudulent practices engaged in by

federally chartered savings and loan associations, so long as the practice is outside the scope of federal regulation. (See *Washington Mutual, supra,* 95 Cal.App.4th at p. 619.) This distinction has been underscored by two decisions decided subsequent to the briefing in this case. In *Lopez v. Washington Mutual Bank* (9th Cir. 2002) 302 F.3d 900, the Ninth Circuit Court of Appeals held that Code of Civil Procedure section 704.080, which exempts Social Security and SSI benefits from any enforcement action, has been preempted by 12 C.F.R. part 557.11 (2002), a deposit-related regulation closely comparable to 12 C.F.R. part 560.2. Because the state statute imposes requirements governing checking accounts, it is preempted by the OTS regulation which "hereby occupies the entire field of federal savings associations' deposit-related regulations." (*Lopez,* 302 F.3d at p. 907.) In contrast, in *Gibson v. World Savings and Loan Assn., supra,* 103 Cal.App.4th 1291, the Fourth Appellate District held that 12 C.F.R. part 560.2 does not preempt a class action under the UCL alleging that World charges borrowers more for replacement hazard insurance than authorized by the terms of the governing deeds of trust, and that World fraudulently misrepresents the cost of the replacement insurance. We agree fully with the court there that "the duties of a contracting party to comply with its contractual obligations and to act reasonably to mitigate its damages in the event of a breach by the other party, . . . not to misrepresent material facts, and . . . to refrain from unfair or deceptive business practices" (*Gibson,* at p. 1301), upon which the claims in that case were based, "are not requirements or prohibitions of the sort that [part] 560.2 preempts" (*id.* at p. 1302). As the court explained, these duties are not directed toward federal savings associations, but to "anyone engaged in any business and anyone contracting with anyone else," so that "they do not purport to regulate federal savings associations and are not specifically directed toward them. . . . Any effect they have on the lending activities of a federal savings association is incidental rather than material." (*Ibid.*)

In *Galecki,* the court concluded that it "need not determine the full breadth of the term 'operations of a federal Association' because there can be no dispute that such phrase extends at least to the regulation of mortgage escrow accounts and mortgage loan disclosures." (*Galecki, supra,* 707 F.Supp. at p. 405.) Here, we do no more than reach the same conclusion with respect to the regulation of payoff demand statements and the fees that may be charged for providing them. We hold that Civil Code section 2943 is within the scope of those provisions that 12 C.F.R. part 560.2 (2002) is intended to preempt. Therefore, if the regulation itself has been authorized by Congress, neither the cause of action for violating Civil Code section 2943 nor the cause of action for engaging in a practice deemed unlawful or unfair because it violates that provision can proceed.

B. *12 C.F.R. Part 560.2 (2002) Is Within the Scope of OTS's Delegated Authority.*

 The Attorney General constructs an elaborate argument that Congress "did not imbue OTS with the authority to nullify state laws by a general declaration of regulatory fiat in the absence of any specific regulatory requirement whose prescribed operation would supersede state law. To the extent that OTS attempts to displace state law by edict, its action is improper and should not be given deference by the court." The Attorney General argues that while, under *Chevron, U.S.A. v. Natural Res. Def. Council* (1984) 467 U.S. 837 [104 S.Ct. 2778, 81 L.Ed.2d 694], courts may defer to regulations construing a statute which a federal agency is charged with administering—so-called *Chevron* deference—such deference is due only where the agency construes the substantive meaning of the statute, and not "where an agency construes the *preemptive effect* of a statute." (See *Smiley v. Citibank (South Dakota), N.A.* (1996) 517 U.S. 735, 743-744 [116 S.Ct. 1730, 1734-1735, 135 L.Ed.2d 25]; *Davis v. Travelers Property and Cas. Co.* (N.D.Cal. 2000) 96 F.Supp.2d 995, 1000.) While the Attorney General may be correct in drawing such a distinction, the issue here is not one of deference at all. The relevant question is not whether the court should defer to OTS's interpretation of HOLA or to OTS's view of the preemptive effect that Congress intended when it enacted HOLA. OTS has not purported to interpret Congress's intention in this regard. Rather, OTS has expressed its own intention as to the scope of state laws to be preempted, and the only question is whether OTS has been authorized by Congress to adopt such a broad regulation.

Both Lopez and the Attorney General argue that OTS has been authorized only to adopt regulations specifying acceptable or unacceptable practices of federal savings associations—which admittedly have preemptive effect—but that it has not been authorized to preempt state laws with respect to lending practices for which it provides no alternative substantive regulation. But neither the language of HOLA nor any of the decisions that have interpreted it impose such a limitation on OTS's rulemaking authority. Both *Siegel* and *Highland* quote the following paragraph from *Eureka Federal Sav. and Loan Ass'n v. Kidwell* (N.D.Cal. 1987) 672 F.Supp. 436, 439: " 'The language of HOLA, as well as the history that lies behind its enactment, demonstrate that there is a strong federal interest in the uniform treatment of the federally chartered savings and loan associations. Congress initially enacted HOLA and its regulatory structure in response to a crisis in the nation's private home financing system. [Citation.] This crisis had developed at least in part as a result of the inconsistent and ill-advised practices of the various

states. As noted by the Ninth Circuit, "the states had developed a hodge-podge of savings and loan laws and regulations, and Congress hoped that [the bank board's] rules would set an example for uniform and sound savings and loan regulations." [Citations.]' " (*Siegel, supra,* 210 Cal.App.3d at p. 959; *Highland, supra,* 14 Cal.App.4th at p. 1704.) Thus, section 5(a) of HOLA authorized the Federal Home Loan Bank Board, "under such rules and regulations as it may prescribe, to provide for the organization, incorporation, examination, operation, and regulation of associations to be known as 'Federal Savings and Loan Associations' . . . giving primary consideration to the best practices of local mutual thrift and home-financing institutions in the United States." (12 U.S.C. § 1464(a)(1).) And in *Fidelity, supra,* 458 U.S. at pages 161-162 [102 S.Ct. at pages 3026-3027], the Supreme Court observed that "By so stating, Congress plainly envisioned that federal savings and loans would be governed by what the Board—not any particular State—deemed to be the 'best practices.' See also *First Federal Sav. & Loan Assn. v. Massachusetts Tax Comm'n,* 437 U.S. 255, 258, n. 3 [98 S.Ct. 2333, 2335, 57 L.Ed.2d 187] (1978) (observing that the HOLA 'protects federal associations from being forced into the state regulatory mold'). Thus, the statutory language suggests that Congress expressly contemplated, and approved, the Board's promulgation of regulations superseding state law."

*Fidelity* was a case in which state law prohibiting due-on-sale clauses was held to be preempted by a substantive regulation on the same subject that had been adopted by the federal agency. Nonetheless, the statutory authorization to adopt regulations governing the operations of federal savings associations is broad enough to encompass a regulation prohibiting state limitations on their lending practices, including the loan-related fees that they charge, even if the federal agency does not consider it necessary to impose limitations of its own. OTS's decision to give the associations "maximum flexibility to exercise their lending powers in accordance with a uniform federal scheme of regulation" reflects a determination that all associations should be permitted to establish their own policies and to set their own fee schedules unless and until OTS imposes limits on particular practices or fees that are applicable nationwide. Neither *Siegel, Highland,* nor *Fenning* questioned the federal agency's authority to have adopted part 545.2 of 12 C.F.R. (2002). Admittedly, as indicated above, those cases interpreted the former regulation to preempt state law only where OTS had exercised its authority to regulate a specific matter. *Galecki,* however, implicitly held part 545.2 to have been congressionally authorized "whether or not the regulations substantively regulate that aspect of the operations" over which state law is preempted. (*Galecki, supra,* 707 F.Supp. at p. 405.)

And in *Washington Mutual*, in which the California statute limiting preclosing interest was held to have been preempted by part 560.2 despite a " 'complete absence of OTS regulations on the issue of preclosing interest' " (*Washington Mutual, supra*, 95 Cal.App.4th at p. 620), the Second Appellate District concluded that "[w]hile the language of 12 Code of Federal Regulations [part] 560.2 is sweeping, . . . the OTS in promulgating this preemptive regulation exercised the kind of discretion that Congress intended to delegate to it in HOLA." (*Washington Mutual, supra,* at p. 618.) We find no reason to disagree with this conclusion. OTS has been authorized to adopt regulations to eliminate a "hodgepodge" of restrictions imposed by the various states on the operations of federal savings associations. (*Eureka Federal Sav. and Loan Ass'n v. Kidwell, supra,* 672 F.Supp. at p. 439.) There is no evidence suggesting that Congress conditioned this authority on the promulgation of federal regulations touching on every practice that any state had chosen to regulate.

Hence, we conclude that OTS has been authorized by Congress to promulgate 12 C.F.R. part 560.2 (2002). Since we have also concluded that this regulation is intended to preempt state restrictions on loan-servicing fees such as payoff demand fees charged by federally chartered savings associations, we hold that, insofar as it applies to federal savings and loan associations, Civil Code section 2943 has been preempted by the federal regulation, as has any cause of action under the UCL that is predicated on a violation of section 2943.[9]

## 2. Breach of Contract

Approximately a year after holding the Civil Code section 2943 and UCL claims preempted, the trial court summarily adjudicated against Lopez the remaining common law claims, including the cause of action for breach of contract. ▮ This cause of action was based on the allegation that by charging a $10 fee for faxing the payoff demand statement, in addition to $60 for the statement itself, World breached paragraph 30 of the governing deed of trust, which reads as follows: "Lender may collect a fee of $60.00 or such greater maximum amount as may from time to time be permitted by

[9]This conclusion does not fully dispose of the first cause of action for violating the UCL, since that cause of action is predicated both on the alleged violation of Civil Code section 2943 and on World's alleged practice of breaching the terms of its deeds of trust by charging the additional $10 for faxing the payoff demand statements. However, since we conclude, *post*, that charging this additional fee does not constitute a breach of the contracts entered by World, this additional theory also fails to support a cause of action under the UCL. Thus, the first cause of action was properly dismissed, even if not entirely upon the ground of federal preemption.

law,[10] for furnishing any statement of obligation with respect to this Security Instrument or the Secured Notes."

The breach of contract claim presents a number of questions that might be approached from several directions. Lopez's refinancing was carried out through an escrow account at Chicago Title, and the escrow officer who requested the payoff demand statement for Lopez asked that it be transmitted by fax after having been advised by World that there would be an additional $10 fee for doing so. Lopez contends the escrow officer's agreement to pay the $10 fee represented a modification of paragraph 30, and that since there was no writing signed by Lopez and World, the agreement was ineffective because the deed of trust also contained a provision requiring a writing signed by the borrower and the lender in order to modify its terms. World argues, and the trial court held, that the title company was Lopez's agent and entered a fully executed oral agreement to pay the $10 fee that was effective even if the fee did represent a modification of the deed of trust. In concluding that such an executed oral agreement is effective, the trial court relied upon *Conley v. Matthes* (1997) 56 Cal.App.4th 1453 [66 Cal.Rptr.2d 518], which Lopez argues is inapposite because the contract that was modified in that case did not contain an explicit prohibition of modifications without a subsequent writing.

The more fundamental question, however, is presented by the trial court's alternative holding that the title company's agreement on behalf of Lopez to pay an additional fee of $10 for transmitting the payoff demand by fax did "not represent a modification of the agreement contained in the deed of trust. The deed of trust is silent as to method of transmittal and what will occur if the borrower seeks an 'expedited' delivery." In support of the summary judgment motion, the following facts were undisputed: "World's practice is to comply with ¶30 of the deed of trust by furnishing payoff Demands by mail at a fee of $60. Nevertheless, borrowers are told that they may request a facsimile response which will be sent for a separate fee of $10. The borrowers, not World, make this election." In view of these admitted facts, the trial court in effect held that furnishing the statement by mail (for $60) satisfies the terms of the deed of trust, and that demanding an additional $10 for expediting the delivery by fax transmission is not covered by, or inconsistent with, the deed of trust.

In opposition to the motion, Lopez submitted evidence tending to show that fax is the method by which World delivers most payoff demand

---

[10]We do not consider the implication of our conclusion that Civil Code section 2943 has been preempted upon the interpretation of this contractual provision, since this issue was not addressed in either the trial court or the appellate briefs.

statements. Lopez is correct that this evidence was sufficient to create a triable issue as to the accuracy of the statement contained in the trial court's order that "[i]n common parlance . . . a mail copy is the expected transmittal of such a document . . . ." Nonetheless, the trial court's ruling does not rest on a factual determination as to whether mail or fax is the "expected" or usual method of delivery. The question is not a factual one as to which method is more common, but a legal one as to whether delivery by mail is sufficient to satisfy the terms of the deed of trust. We may accept the contention implicit in Lopez's argument that paragraph 30 must be read to require delivery of the payoff demand statement in a commercially reasonable manner. As Lopez argued in the trial court, "There is no reasonable construction of the instrument which would allow World to simply prepare the payoff statement, and withhold it until the borrower provides additional consideration." And we may also agree with Lopez that "furnish" does not mean "provide by mail." But none of this is to deny that delivery by mail is one commercially reasonable method of delivery. Lopez offered no evidence to show otherwise. Even if Lopez is correct that "fax transmission of demand statements is *the* predominant means of transmission," World complies with its obligations under the deed of trust by furnishing the statement by any commercially reasonable method of transmittal, including mail. Paragraph 30 requires no more of it, so that the deed of trust does not constrain World from charging an additional fee for transmitting the statement by some other means, even if the other means is another commercially reasonable method of delivery. Under the terms of the deed of trust, World certainly may impose a charge in excess of $60 if the borrower requests delivery of the statement by messenger. The result is no different if the request is for delivery by fax transmission, regardless of how common such requests may be. Hence, the trial court correctly granted summary adjudication on the breach of contract cause of action.

## 3. *Fraud and Unjust Enrichment*

Lopez's fraud claim is based on the contention that World's failure to disclose its fax fee policy to borrowers before making a loan is fraudulent because the deed of trust entered as part of the loan transaction promises to furnish a payoff demand statement for $60. In granting summary judgment, the trial court did not specifically address the fraud cause of action, and before this court Lopez has acknowledged that the viability of the fraud claim is dependent on the outcome of the breach of contract cause of action. Because we read the deed of trust to permit transmittal of a payoff demand statement in any commercially reasonable manner, rather than necessarily by either mail or by fax, Lopez's evidence that fax delivery is the predominant method utilized fails as well to create a triable issue with respect to the fraud

cause of action. By failing to advise prospective borrowers that it will charge an additional $10 to transmit payoff demands by fax, World is not concealing an intention to breach the terms of the deed of trust. And since fax is not utilized unless chosen by the person requesting the payoff demand after the additional fee has been disclosed, World's conduct is not deceptive or otherwise fraudulent. Hence, summary adjudication was also proper as to this cause of action.

Finally, Lopez failed to argue either in the trial court or in its briefs to this court that there is any reason why the unjust enrichment cause of action withstood the summary judgment motion. Accordingly, the issue has been waived. (9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 594, pp. 627-629.)

### Disposition

The judgment is affirmed.

Corrigan, Acting P. J., and Parrilli, J., concurred.

Appellant's petition for review by the Supreme Court was denied May 14, 2003.